MODIFIED: NOVEMBER 23, 2011
RENDERED: JUNE 16, 2011
TO BE PUBLISHED

$\mathfrak{Supreme\ Court\ of\ Kentucky}$

2008-SC-000860-MR
2008-SC-000925-MR
2008-SC-000957-MR

BRIAN KEITH MOORE        APPELLANT/CROSS-APPELLEE

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.       HONORABLE JAMES M. SHAKE, JUDGE
NO. 79-CR-000976

COMMONWEALTH OF KENTUCKY       APPELLEE/CROSS-APPELLANT

## OPINION OF THE COURT BY JUSTICE NOBLE

## AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

This case arises from a post-conviction petition for DNA testing related to the 1979 robbery, kidnapping, and murder of Virgil Harris in Louisville, Kentucky. Appellant, Brian Keith Moore, was convicted of the crimes and sentenced to death. This Court overturned the initial conviction and remanded for a new trial. *See Moore v. Commonwealth*, 634 S.W.2d 426 (Ky. 1982). On retrial, Appellant was again convicted and sentenced to death. This Court affirmed the conviction and sentence. *See Moore v. Commonwealth*, 771 S.W.2d 34 (Ky. 1988). Appellant unsuccessfully sought to collaterally attack his conviction and sentence at both the state and federal levels. *See Moore v. Commonwealth*, 983 S.W.2d 479 (Ky. 1998) (denying RCr 11.42 and CR 60.02

relief); *Moore v. Parker*, 425 F.3d 250 (6th Cir. 2005) (denying habeas corpus relief).

Appellant pursued post-conviction DNA testing under KRS 422.285 in the circuit court. He now comes before this Court seeking additional DNA testing beyond that ordered below or, in the alternative, to vacate his conviction and sentence for several reasons, including the post-trial loss of evidence that was to be tested for DNA. The Commonwealth cross-appeals as to several issues. This Court disagrees that Appellant has demonstrated that his conviction and sentence should be vacated, but agrees that the circuit court erred in reading its power to order certain DNA testing to be limited by statute. The Commonwealth's cross-appeal is without merit. For these reasons, the circuit court is affirmed in part, reversed in part, and this matter is remanded for further proceedings.

## I. Background

## A. Factual Background

Because this case stems from a collateral attack on Appellant's conviction under Kentucky's capital post-conviction DNA statutes, rather than a direct appeal of the conviction, a detailed recitation of the facts of Appellant's trials and crimes is unnecessary. Those facts are laid out in detail in the cases cited above. But while it is unnecessary to recount all of the facts, at least some discussion of them is necessary to frame Appellant's claims related to DNA testing, which in turn depend on his claim that another person committed the crimes.

2

The victim, Virgil Harris, was abducted while running errands for his business and murdered a short time later. On the morning of his murder, he left his store, driving his maroon Buick, to obtain several rolls of coins from his bank and then to buy bananas for his ice cream parlor from a nearby grocery store. As he was leaving the grocery, around 11:45 a.m., Harris was abducted at gunpoint. A witness later testified to seeing a man matching Appellant's description pointing a gun at the driver of a maroon car in the grocery parking lot. Later that day, Appellant was seen driving a maroon car, which he claimed belonged to his uncle.

Police first learned of the incident not by finding the body but from Kenny Blair, one of Appellant's friends, who was awaiting sentencing for a robbery conviction. Blair asked his attorney to contact the prosecutor to offer information about the murder of a police officer's father in exchange for a reduced sentence. He claimed to have learned of the crime directly from Appellant.

Harris's body was later found almost ten miles away in southern Jefferson County. He had been pushed down an embankment and shot four times in the head at close range. His car was found in the parking lot of the apartment complex where Blair lived. When police found Appellant, he had Harris's car keys and wristwatch, and the likely murder weapon. Some of the victim's papers were found in the glove box of the car in which Appellant was riding at the time of the arrest. After the arrest, Appellant confessed to the crime to three police officers and made incriminating statements in front of a

corrections officer.[1] He had previously confessed to Blair and his girlfriend, Lynn Thompson.

At trial, Blair testified against Appellant, claiming that Appellant had admitted to the crimes the night after they were committed. Other testimony established that several days prior to the crimes, Appellant had been living at the home of Blair's mother but had moved into Blair's apartment about two days before the crimes. Blair's mother testified that Appellant showed up at her house around 1:00 p.m. the day of the murders and was wearing a set of dark clothes. She stated that Appellant asked for a change of clothes and left what he had been wearing in her laundry.

Lynn Thompson, Blair's girlfriend at the time, testified that the clothes Appellant left behind belonged to her father and that she turned the clothes over to the police. She also stated that she and Blair had sublet their apartment from her father, John Thompson, who had left several items behind, including clothes.

Appellant's various confessions were also admitted into evidence. The Commonwealth's evidence also included evidence of Appellant's fingerprint in the maroon car and on some of the proceeds of the robbery, gunshot residue evidence from Appellant's hands, expert testimony from an FBI forensic analyst

---

[1] This may have been the most damning evidence. According to the corrections officer, Appellant boasted to a fellow prisoner that he had committed the crime and that the victim's dying convulsions were funny. He told the fellow prisoner that "it was a pig's father" and that the "only thing [he] regret[ted] is that it wasn't the pig [he] killed." Apparently, Mr. Harris's son was a police officer. Appellant also referred to the corrections officer in the conversation, stating, "There's nothing he can do about it anyway. If I had the opportunity I'd just as soon kill him."

that soil on some of the clothes matched that at the crime scene, and evidence that the bullets used in the murder matched Appellant's gun and that similar bullets were found where Appellant was staying at the time of the crimes.

Appellant's defense strategy blamed Blair for the crime. Appellant admitted to driving the victim's car, but claimed he had only borrowed it from Blair, who had stolen it. He also denied having fired a gun, committing any of the crimes, or confessing to the police, claiming as to the latter that the police told him they would make up a confession if he did not confess. And he offered the testimony of seven witnesses, including one of Blair's cellmates, who claimed that Blair admitted to committing the crimes and then framing Appellant.[2] He also argued that he could not have worn the pants admitted into evidence because they were too small.

Blair, however, had an alibi, albeit a shaky one. The Commonwealth offered testimony from a clerk at the driver's license office that Blair had been there at some point between 11:00 a.m. and 12:30 p.m. the day of the crimes, though she could not be specific. Thompson also claimed to have accompanied Blair to the driver's license office. Moreover, tests failed to reveal gunshot residue on his hands shortly after the crimes and his fingerprints were not found in the victim's car or on some of the stolen items.

After hearing all this testimony, the jury apparently believed the evidence against Appellant instead of that about Blair and, as a result, convicted

---

[2] At a post-conviction hearing on his first CR 60.02 motion, discussed in more detail in *Moore v. Commonwealth*, 983 S.W.2d 479 (Ky. 1998), Appellant offered the testimony of three additional witnesses who claimed that Blair admitted to the killing and that he framed Appellant.

Appellant and sentenced him to death. The result of his first trial was reversed, but on retrial, with much the same evidence, Appellant was again convicted and sentenced to death.

Appellant's second direct appeal and state and federal collateral attacks followed.

## B. Procedural Background

Very soon after the conclusion of his federal habeas litigation, Appellant filed a post-conviction DNA testing petition in the Jefferson Circuit Court. Over the course of two years, the circuit court heard multiple motions from both Appellant and the Commonwealth, and issued multiple opinions and orders before the claims were ripe for appeal. The portion of the circuit court's file covering the DNA petition covers approximately 1000 pages. Given the number of motions and decisions at the court below, a review of several of them is necessary to frame the issues to be decided.

### 1. Initial Petition and Motions, and June 22, 2006 Order

In 2006, Appellant filed a petition under KRS 422.285 to have several items of evidence from his trial tested for DNA, which he claimed could exculpate him. He specifically asked for testing of the shoes and pants that were introduced as evidence at trial, as exhibits 28 and 29, and which were not part of the court's file but which may have been in either the circuit court clerk's or Commonwealth's possession. He also asked that some of the victim's clothing, wallet, and money bag be tested.

The Commonwealth responded that finding another person's DNA on the items would not have exonerated Appellant. As to the shoes and pants specifically, the Commonwealth claimed that Appellant was not wearing them at the time of the arrest and claimed that no one had alleged he had worn them on the day of the murder, though the Commonwealth had offered those items in evidence at trial against Appellant and introduced circumstantial evidence that he had worn the clothes during the murder.

Before the trial court decided the petition, Appellant further moved that the Commonwealth be required to preserve any evidence that could be subject to DNA testing. He thereafter moved that the court order DNA testing by an independent laboratory and that even if he did not satisfy KRS 422.285, the court ordered the evidence released so that his counsel could get it independently tested for DNA with his own funds. In addition to KRS 422.285, Appellant claimed that the court had authority for such orders under Section 109 of the Kentucky Constitution and the Eighth and Fourteenth Amendments of the United States Constitution. The Commonwealth strenuously objected to independent testing, arguing that the DNA testing statutes only allow testing by the Kentucky State Police Forensic Laboratory (hereinafter, "KSP Laboratory").

Shortly thereafter, Appellant also moved that evidence be placed in the court's file for ease of access by him, that he be allowed to inspect the evidence, that the Commonwealth be required to comply with the inventory requirement of KRS 422.285(6), and that the Commonwealth be required to disclose all

7

material and exculpatory evidence not previously disclosed. In support of this motion, Appellant noted that some of the evidence had been stored in other locations and had been "misplaced in the past, thereby preventing previous counsel and current counsel from examining the evidence." Appellant attached a partial transcript of his RCr 11.42 hearing at which preservation and loss of evidence was discussed. Interestingly, the transcript specifically mentions "two pairs of pants" that Appellant's counsel sought to examine for sizing and fitting purposes but which appeared to be lost at the time, though it is not clear from the transcript if the pants in question then are the same ones Appellant has now asked to be tested for DNA.

A short time later, Appellant filed a supplemental motion offering an example of DNA exoneration in New York and "suggesting" that specific types of DNA testing be conducted. Appellant noted that one of the basic DNA tests is polymerase chain reaction (PCR) testing, but that samples are sometimes too small or degraded to allow such testing. According to the motion, smaller, even microscopic, or degraded samples can sometimes be tested by more advanced methods, including mitochondrial DNA testing and short tandem repeat (STR) testing, which Appellant specifically requested.[3] Appellant also claimed that any person who had worn the clothing—and the Commonwealth claimed he had—likely would have left behind bodily fluids, such as sweat, or skin cells from which a minute amount of DNA could be extracted and tested.

---

[3] Appellant notes in a later motion that the state lab does conduct STR testing. It appears, then, that he was asking for a variant of STR testing, which is only performed by other laboratories, and which he identified and discussed in the later motion.

As required by KRS 422.285(6), the Commonwealth provided an inventory of physical evidence that included the pants, shoes, and several other items of clothing that Mrs. Blair had claimed Appellant wore the day of the killing. This clothing had originally belonged to another man, Lynn Thompson's father, and was found in a laundry pile at the home of Kenny Blair's mother. The Commonwealth was unable to find some items, such as the victim's money bag, and several motions related to this lost evidence, including one to take depositions, followed.

Later still, Appellant filed a notice with the circuit court that his counsel had taken a DNA sample from one of Blair's relatives, a nephew, for comparison testing (Blair died in 1995) and moved for comparison testing.

On June 22, 2006, the circuit court ruled on Appellant's petition and many of his motions. The court ordered that any evidence in the Commonwealth's possession be preserved and that the Commonwealth prepare an inventory of evidence in its possession but denied the motion to put evidence in the court's record, requiring instead that the evidence be made available for Appellant's inspection. The court also denied the motion for independent testing, ruling that KRS 17.176 required that any testing be done by the KSP Laboratory or an outside laboratory of its choice and that KRS 524.140(5) placed restrictions on the KSP Laboratory in such testing. The court also noted that no evidence of "fault or bias" on the part of the police had been offered that might persuade the court to order independent testing anyway.

In the same order, the court granted Appellant's motion for DNA testing. The court recounted the evidence against Appellant, which included multiple confessions, gunshot residue on Appellant's hand when arrested, that Appellant's fingerprints were found in the victim's car and on rolls of coins that the police recovered, testimony that he had been seen in the victim's car, documents belonging to the victim were found in Appellant's car, ammunition similar to that used in the killing was found where Appellant was staying at the time of the crime, Appellant had the victim's watch and gave proceeds from the robbery to other people (Blair and Thompson), and most importantly, testimony from Kenny Blair, who originally alerted the police to the crime and whom Appellant claimed committed the murders. The court concluded that the evidence of Appellant's guilt was "equally consistent with [his] assertion that he was set up by Blair and his girlfriend."[4]

The court held that Appellant had satisfied the requirements of KRS 422.285 that there be a reasonable probability that he may not have been prosecuted or convicted if DNA exculpatory evidence is present, and of KRS 17.176 that the evidence to be tested is probative. Thus, the court concluded that it was required under KRS 422.285(2) to order testing. The court also

---

[4] Though the court did not discuss it in detail, other testimony supported Appellant's theory that he had been framed. In addition to his own testimony, wherein he admitted to driving the victim's car but claimed he had only borrowed it from Blair, who had stolen it, he also offered the testimony of multiple witnesses who claimed that Blair admitted to committing the crimes and then framing Appellant. Also supporting the court's conclusion is the fact that the persons to whom he allegedly gave proceeds of the robbery were Blair and Thompson, and that the place where evidence like the bullets was found was Blair's apartment, which was where Appellant was staying at the time of the crimes.

concluded that the requirements of KRS 422.285(3), which gives the court discretion to order testing, had been met. However, the court declined to order the use of the specific type of DNA testing requested by Appellant, noting again that it was "empowered to send evidence to KSP or its designee for sampling and testing" but that "it is unclear whether KSP or another laboratory within its purview is set up to conduct the STR DNA testing recommended by Moore."

Finally, the court declined to order testing of the sample from Blair's nephew, noting that testing under KRS 422.285, in order to be exculpatory, needed to exclude Appellant, not simply demonstrate the presence of another person's DNA. The court noted that only upon a showing of exclusion of Appellant would comparison testing of other people be appropriate.

## 2. The Commonwealth's and Appellant's Motions to Reconsider, Request for Specific Types of Testing at an Outside Laboratory, and October 11, 2006 Order

The Commonwealth moved the circuit court to reconsider its June 22 order, arguing that it was too broad, failed to include findings of fact as to each item of evidence to be tested, and erred in concluding that the evidence at trial was equally compatible with Appellant's guilt and having been framed. The Commonwealth also asked the court to hold a *Daubert* hearing on the validity of Moore's theory that DNA from sweat could be on the clothing.

The Appellant also moved for reconsideration of the decision to deny independent testing and designation of who was required to pay for the testing. The Appellant also requested clarification about the Commonwealth's duty to

11

supplement its inventory of the evidence. In this motion, he specifically identified an outside laboratory, Orchid Cellmark Laboratory, which could and should perform more advanced tests than the KSP Laboratory, and argued that tests performed by the state laboratory could destroy evidence that might thereafter make more advanced testing impossible. He also raised another type of DNA testing not previously identified in his motions, Y-STR, which is STR testing of the Y-chromosome, which is present only in males. This type of testing is more sensitive than ordinary STR testing and, according to Appellant's motion, "is useful when there is cross contamination of a sample and specific male DNA needs to be isolated." He also again raised the possibility of mitochondrial DNA testing, which he stated "allows for testing when all the nuclear material from a cell has degraded." He noted that the state laboratory conducts neither type of test, but that it does employ Orchid Cellmark to conduct such testing. He also noted that the state lab does perform standard STR testing, but that such testing is likely to destroy the entire sample, which would make additional testing impossible.

In response, the Commonwealth argued, in part, that the state lab was capable of determining whether it could perform the appropriate tests and that it would no doubt inform the court if it could not and would then employ an outside lab to perform the test. The Commonwealth stated, "Immediately bypassing the KSP lab . . . is not appropriate under the statute."

12

The Commonwealth's motion for reconsideration was denied on October 11, 2006.[5] The court held that the fluid standard in KRS 422.285 did not require specific findings as to each piece of evidence to be tested. The court also held that STR testing, which is a type of the ordinarily used PCR testing, was automatically admissible as a standard DNA test and required no *Daubert* hearing. The court did not discuss Y-STR testing or the Commonwealth's objection to the Appellant's "sweat theory." The court also denied reconsideration of its decision to deny independent testing but stated that the cost of testing the first five items would be borne by the Commonwealth, with any additional testing to be paid for by Appellant. The court clarified the Commonwealth's duty regarding its inventory, stating that it has a "continuing duty to supplement . . . should any evidence come to light."

### 3. Loss of Evidence and CR 60.02 Motion

Following the October 11 order, in January 2007, Appellant renewed his motion for independent DNA testing, claiming that new information had arisen, including allegations that the state lab was biased, could not perform the most modern DNA test, and would not recognize when those tests should be performed, and that Orchid Cellmark, who the state lab uses for outside testing, had recently suffered problems that called into question its reliability (and led to another state cancelling its contract with the lab). The Appellant then asked for alternative testing by a lab other than Orchid Cellmark or, in

---

[5] Before the court could rule on these motions, on July 21, 2006, the Commonwealth filed a notice of appeal of the June 22 order. The appeal was dismissed by this court on December 18, 2006, because the circuit court had not rendered a final and appealable decision.

13

the alternative, an order barring the state from using Orchid Cellmark in this case. The Commonwealth objected on February 19, 2007, arguing that the Appellant's motion was a "belated, successive motion for reconsideration" that "is procedurally barred" and offering evidence that Orchid Cellmark was still a valid, reliable source of DNA testing. The circuit court denied Appellant's motion, finding that he had failed to demonstrate bias or problems with Orchid Cellmark's testing for the Kentucky State Police (and noting that the information about Orchid had come from one of its competitors in the private DNA testing market).

Appellant also filed his notice of items to be tested for DNA. The notice included a pair of pants and shoes worn by the killer, which had been exhibits 28 and 29 at trial, along with the victim's clothing, wallet, and money bag. When the Commonwealth went to test the items, the pants and shoes were found to be missing. Apparently, when the Commonwealth prepared its inventory, it had only reviewed the labels on the evidence containers, fearing that opening them might lead to contamination of the evidence. The labels indicated that the pants and shoes were included, which turned out not to be the case once the containers were opened.

On June 1, 2007, Appellant filed a motion under CR 60.02(e) and (f) asking that this conviction or sentence be vacated because the Commonwealth had lost the shoes and pants. The court reserved ruling on the CR 60.02 motion and gave the Commonwealth 60 days to conduct a thorough search for the missing evidence.

## 4. December 10, 2007 Order

The Commonwealth undertook a substantial search for the missing items, contacting over a dozen individuals and multiple police and other state agencies. The police dedicated overtime effort to find the items. Ultimately, however, the search was unsuccessful. The Commonwealth reported the results of the search to the court on November 13, 2007. As a result, the Commonwealth again moved the court to reconsider the portion of the June 22 order that would require testing of the shoes and pants, because results of such testing would be irrelevant, since Kenny Blair could not have worn the clothing in question (as he allegedly weighed about 300 pounds at the time of the crime and the clothes were from a man who weighed about 180 pounds), and because such testing would be impossible.[6] The Commonwealth also moved the court to compel Appellant to provide a DNA sample for comparison to the tests on the items that could be found. The Appellant objected to giving a DNA sample and comparison testing.

On December 10, 2007, the court denied the motion to compel Appellant to give a DNA sample, holding that such comparison testing was premature when the items of evidence had not yet been tested. As to the missing items, the court found that the Commonwealth had engaged in "reasonable diligence"

---

[6] This would be a motion to reconsider following the denial of a motion to reconsider the same order, which is, ironically, what the Commonwealth accused Appellant of in its February 19 response to Appellant's "renewed motion."

The Commonwealth's motion to reconsider also claimed that "it was proved at both trials" that Appellant had been wearing the clothing he seeks to have tested, despite its assertions in earlier filings that such a fact has not even been alleged.

15

to find them. The court noted, "Simply put, where there are no items for testing, the Court cannot find potential testing to be 'outcome determinative.'" As a result, the court denied the Commonwealth's motion for reconsideration, noting that the loss of the evidence rendered moot any reconsideration of its order and stating, "The Commonwealth recites arguments that this Court has rejected on two prior occasions and the Court is not inclined to re-visit those issues without case law authorizing it to do so." The court also denied Appellant's CR 60.02 motion, holding that such relief is not available simply because evidence to be tested for DNA is not available and that the proper action was to dismiss the DNA petition as to those items.

Appellant sought an appeal to this Court at that time, which was denied because the trial court had not issued a final and appealable order.

### 5. DNA Testing

The KSP Laboratory performed regular STR testing in March 2008. The items tested included an envelope, a wallet, a blue shirt, a black coat, and a check. The amount of DNA extracted from the items was limited, however. The analyst's report states, "Partial DNA profiles were obtained [from some of the items] but were too limited for interpretation. No further analysis was conducted."

Though Appellant had previously objected to the Commonwealth obtaining a comparison DNA sample from him, when the DNA results of testing on the items came back, he announced that his counsel would provide one, a self-collected buccal sample, to the KSP Laboratory. The Commonwealth moved

16

the circuit court for an order barring the testing of this self-collected sample, arguing, "The honor system is not acceptable in this matter. The idea of a condemned prisoner collecting DNA from himself should be rejected out of hand." A few days later, the Commonwealth also moved the court to order the KSP Laboratory to communicate and cooperate with it. According to the Commonwealth, Appellant's counsel had told the analyst at the KSP Laboratory "that she and the lab were his 'client' and 'he would rip [her] a new one for talking with [the Commonwealth].'"

The trial court sustained the motion to require the laboratory to communicate with the Commonwealth but declined to bar testing of the self-collected specimen. The state lab then did a comparison of the sample submitted by Appellant to the partial DNA profiles found on the items previously tested. Again, the analyst reported that "[p]artial profiles were obtained . . . but were too limited for interpretation." However, the analyst also returned the specific results from the various tests, which appear to demonstrate the presence of DNA from multiple people.[7]

After receiving the results, Appellant moved for further DNA testing, specifically Y-STR testing. In support of the motion, he noted that the KSP Laboratory had been unable to confirm or eliminate him as having contributed biological material to the items but that the tests indicated the presence of DNA

---

[7] Though it is not immediately clear from the record or the briefs, it appears that copies of the analyst's report and results were given to the Commonwealth. The Commonwealth discusses these items at length and even quotes from them. As the trial court properly ruled, the KSP Laboratory should cooperate with the Commonwealth, including disclosing the results of DNA testing under KRS 422.285.

17

from multiple people. Appellant also recounted discussions with an analyst at the KSP Laboratory, who stated that the more advanced testing could be done at the Commonwealth's contract lab, Orchid Cellmark, and with an analyst at Orchid Cellmark, who stated that Y-STR testing could be useful in this case. Appellant then asked for further testing at an outside lab of his choosing, citing his previous concerns with Orchid Cellmark, or alternatively additional testing at Orchid Cellmark.

The trial court reviewed the results of the DNA testing done by the KSP Laboratory and found that "the testing reveals that male DNA is present on the items test[ed]. Although the DNA is consistent with [Appellant's] sample, it also indicates the presence of another man's DNA, . . . 'non-match DNA evidence.'" Nevertheless, the court denied the Appellant's motion, again holding that KRS 17.176(1) and KRS 524.140(5) require that testing be done only by the KSP Laboratory or its designee and that it was "without authority to make orders not specifically authorized by statute." The court also noted that KRS 422.285(8) requires dismissal of the petition if the results of testing are not favorable to the petitioner, and that inconclusive results do not demonstrate a "reasonable probability of innocence."

### 6. November 7, 2008 Order

Soon thereafter, Appellant moved the court to vacate his conviction or sentence under KRS 422.285 because another person's DNA had been found on some of the items tested. In an order dated November 7, 2008, the trial court treated this as a CR 60.02 motion to vacate. Again, the court noted that

18

results of the DNA testing show that "[t]he [Appellant] was not excluded as the donor of the DNA on the items tested" but that "another individual's DNA was also present on those items." The court noted that some states, such as Tennessee and Texas, treat inconclusive results as being "unfavorable" and "inconsistent with a 'reasonable probability of innocence.'" The court also noted that other states, such as Kansas, treat the presence of another person's DNA on items as favorable but not conclusive evidence of innocence; instead, such favorable findings must be weighed against the evidence of guilt. After reviewing that evidence, as described above, the court concluded that "even if it were demonstrated that another individual contributed DNA to the 'murder clothes,' the probative value of the trial evidence is undiminished. Thus, it would be inappropriate to set aside the [Appellant's] conviction." The court also noted that "the DNA results herein do not rise to the level of materiality to counter-balance the evidence produced at trial," and that "when the DNA results do not exonerate or exculpate, the appropriate action is dismissal of the petition." The court then denied the motion to vacate.

### 7. Final Motion and Order

Shortly thereafter, the Kentucky Innocence Project obtained a federal grant to conduct DNA testing in post-conviction cases. On November 13, 2008, Appellant filed a motion for release of evidence for independent testing to be paid for with this grant. The Commonwealth responded that the claim was barred by res judicata and that the Appellant had filed a notice of appeal, which divested the court of jurisdiction. On November 19, the trial court denied

19

the motion, noting, "This Court has previously held that it does not have the authority to grant DNA testing which exceeds the limitations of the statute. That ruling was not based upon the cost of the testing but upon the specific language of the statute requiring testing to occur at KSP." The court also noted that it was without jurisdiction because the matter was already on appeal.

The issue of whether the appeal was pending is unusual. The Commonwealth claims that the notice of appeal was filed on November 10, 2008, three days before the last motion was filed. Appellant claims in his brief that the notice of appeal was not "officially filed" until November 19, and that an order to proceed in forma pauperis was not entered until November 18. The notice of appeal actually has two "filed" dates on it: the clerk's ordinary stamp, dated November 10, and a hand-written filing date of November 19, above which was stamped in bright red ink the words "ON APPEAL" and below which were stamped "DEATH PENALTY" and "FORMA PAUPERIS." The record reveals that Appellant *tendered* his notice of appeal on November 10, along with a motion to proceed in forma pauperis, but his notice was not officially "filed" until that motion was granted per RCr 73.02(1)(b).

## 8. Appeal

Appellant's appeal comes to this Court directly, as a matter of right, because he was sentenced to death. *See* Ky. Const. § 110(2)(b); *Leonard v. Commonwealth*, 279 S.W.3d 151, 155 (Ky. 2009) ("This Court has exclusive appellate jurisdiction over death penalty matters, even when the appeal

20

involves a collateral attack on a sentence of death."). The Commonwealth cross-appeals to challenge several of the trial court's decisions.

## II. Analysis

The Appellant, on appeal, and the Commonwealth, on cross-appeal, raise numerous issues. We address first Appellant's contentions and then, to the extent necessary, the Commonwealth's cross-appeal.

## A. Appellant's Claims

The Appellant claims that the loss of evidence requires the reversal of his conviction or death sentence, or at least an evidentiary hearing in which he can present evidence that the Commonwealth acted in bad faith; that the evidence of another person's DNA on the evidence also requires reversal of his conviction or death sentence; that he should be allowed to have testing performed by an outside laboratory under Kentucky's statutes; that disallowing outside testing violates federal due process; and that the trial court should have ordered the release of the evidence and had the jurisdiction to do so.

### 1. Lost Evidence

### a. The Loss of Evidence Does Not by Itself Require Automatic Reversal or Vacating of Appellant's Conviction or Sentence.

Appellant argues that his conviction and sentence should be reversed or vacated simply because evidence used at his trial was lost after the fact and cannot now be tested for DNA. He makes much of the fact that the trial court, in ordering the testing of the shoes and pants, found that favorable DNA

results would create a reasonable probability that he would not have been prosecuted or convicted, as required by KRS 422.285.

Appellant relies heavily on *Crawford v. State*, 934 S.W.2d 744 (Tex. App. 1st Dist. 1996), in support of his contention that reversal is necessary, but this Court is not convinced of its applicability. First, *Crawford* is not binding on this Court. Second, it is easily distinguishable from this case. In *Crawford*, the defendant claimed on appeal that she had been denied access to impeachment evidence, specifically a crime stoppers report detailing information given to a police officer who testified at trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). She had requested the report at trial, but the trial court had denied her access to it, and on direct appeal the intermediate appellate court agreed that production of the report was not compelled. *See Crawford v. State*, 892 S.W.2d 1, 3-4 (Tex. Crim. App. 1994). The Texas Court of Criminal Appeals reversed and remanded to the intermediate appellate court, which in turn abated the appeal and remanded to the trial court to hold a hearing on the availability and materiality of the report. *See Crawford*, 934 S.W.2d at 746. The trial court discovered that the report had been destroyed by a computer virus in 1991, "either . . . before trial when the virus attacked the computer or after trial when information on the computer was purged." *Id.* at 747. The appellate court then concluded that denial of the report, which had already been found erroneous, could not be harmless error because the state could not prove that the report had been destroyed both in good faith and before the trial. *Id.*

But the *Brady* framework employed in *Crawford* is inapplicable to this case, which involves a post-conviction attempt to get DNA testing that did not exist at the time of the Appellant's trial. There is no claim that the shoes and pants were withheld from Appellant at trial. In fact, as Appellant makes much of in his brief, those items were used as evidence against him in his trial. The subsequent emergence of a new technology for evaluating evidence cannot be used to manufacture a *Brady* violation after the fact. In essence, any DNA that may have been on the missing clothes at the time of trial was not material at that time (and thus not covered by *Brady*) because testing it would have been impossible. Again, as Appellant notes, forensic DNA testing was not developed until many years after his trial. Appellant's "right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. *Brady* is the wrong framework." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2320 (2009).

More importantly, testing under KRS 422.285 requires that "[t]he evidence is still in existence and is in a condition that allows DNA testing and analysis to be conducted." KRS 422.285(2)(b) & (3)(b). If the evidence does not exist, then it obviously cannot be tested, and KRS 422.285 only gives the right to a test, not to reversal of a conviction simply where testing is impossible. Thus, this Court recently held that as a precondition to ordering testing under KRS 422.285, "the trial court must also find that the evidence requested to be tested exists in a condition that will allow proper DNA testing. If it is not, then

23

obviously the inquiry is at an end." *Bowling v. Commonwealth*, 2008-SC-000901-MR, ___ S.W.3d ___, ___, 2010 WL 3722283, at *5 (Ky. Sept. 23, 2010).

Appellant seeks to evade this requirement by arguing that the trial court had already ordered the testing of the missing items, having found that favorable results would likely exonerate him. But as this Court noted in *Bowling*, the evidence to be tested must exist "[e]ven though a trial court may have found reasonable probability that the evidence as described by the movant would exonerate him, lead to a more favorable verdict, or definitely be exculpatory." *Id.* That the trial court's order was mistaken, because the Commonwealth, in turn, was mistaken, about whether the evidence was available does not change this absolute requirement. This Court has previously held that where a given item of evidence is unavailable and other testing is not favorable, then the circuit court is required to dismiss the petition. *See Taylor v. Commonwealth*, 291 S.W.3d 692, 695 (Ky. 2009). This Court adheres to that position and agrees with the circuit court that the only remedy available where evidence sought to be tested under KRS 422.285 is missing is dismissal of the petition, even if only as to the missing evidence.

Moreover, the trial court's finding under KRS 422.285 in support of its order for testing, that there is a reasonable probability that Appellant may have been exonerated if the results of DNA testing were favorable, is not by itself conclusive of anything. Appellant urges that this finding, when combined with the loss of evidence, is sufficient to require reversal of his conviction and sentence, going so far as to claim that the trial court found the evidence was

24

"valuable" and that this therefore creates "grave doubt" about Appellant's guilt. But the circuit court's finding is only relevant and significant to support requiring testing. By itself, without favorable results from a DNA test, that finding is meaningless as it relates to guilt or innocence. The finding is necessarily speculative and conditional, with any actual relief depending on favorable results from the testing. KRS 422.285 is only a mechanism for obtaining post-conviction DNA testing, which in turn might be used to show innocence or be exculpatory to a lesser degree. The statute is not itself a mechanism for speculating about innocence. In making this claim, the Appellant ignores the fact that he has already been convicted at a fair trial, which has been affirmed by this Court. While the system is admittedly imperfect, which is why KRS 422.285 exists in the first place, that fact does not require reversal of a conviction after the fact simply because Appellant can imagine a scenario in which he *might* be shown to be innocent. Where such a showing is impossible due to loss of evidence, even through no fault of the Appellant, he has failed to show entitlement to relief.

Nor does the circuit court's finding mean, as Appellant suggests, that he would definitely have been exonerated by favorable results, which further demonstrates the problem created by the lost evidence. The circuit court ruled only that favorable results would create a reasonable probability of exoneration. But favorable results can come in a variety of forms, ranging from impeaching other evidence all the way to absolute exclusion of the convicted person as having committed the crime. This, of course, is why KRS 422.285

25

does not require reversal of a conviction upon favorable DNA testing and instead requires a further hearing and further orders. *See* KRS 422.285(9).

Evidence that is favorable but merely impeaches, and thus falls short of absolutely excluding the defendant, must be weighed against the other evidence in the case, much like the circuit court did here. In so doing, the court concluded that the DNA results that were obtained, and which were at best only slightly favorable, were insufficient to require reversal of Appellant's conviction.

This Court cannot say the circuit court erred in so concluding in light of the totality of the evidence. Testing of the lost evidence could have been similarly "favorable." A circuit court is not required to speculate, and indeed should not, that lost, untested evidence could have exonerated a KRS 422.285 petitioner and therefore reverse a conviction. Such rank speculation cannot be used to undermine a conviction and sentence that has, in all other respects, been upheld as fairly and lawfully obtained. This Court also declines to engage in such speculation.

Appellant also generally argues that the trial court's finding that the evidence at trial was equally consistent with his guilt as with his theory that he had been framed requires reversal of his conviction in light of the lost evidence.[8] But the trial court's finding in this regard was simply part of its

---

[8] He also notes that the federal district court, in deciding his habeas petition, concluded similarly. It appears, however, that that court actually held that "significant evidence exists that is consistent with Mr. Moore's argument that Kenny Blair killed Virgil Harris." That finding does not go nearly as far as Appellant claims. That the federal district court denied habeas relief also belies his claim about the significance of the statement.

threshold finding about whether favorable DNA evidence would have a reasonable probability of being exculpatory. The trial court does not ordinarily get to review the weight of the trial evidence in a post-conviction collateral attack; absent new evidence, such claims are limited to direct appeals. The trial court in this case made its finding only in the limited context of Appellant's KRS 422.285 petition.

Moreover, Appellant litigated his alternative perpetrator theory in his trials, but the juries simply did not believe his evidence. *See Moore*, 983 S.W.2d at 482. Though Appellant claims that Blair's alibi was proven false after trial, this claim has also already been litigated, in his state collateral attack, and found to be without merit. *See id.*

In the appeal of that decision, this Court, in a unanimous decision authored by then Justice Stumbo, held that the new evidence tending to impeach Blair's alibi, along with new evidence that Blair supposedly admitted to a set-up to additional witnesses, was insufficient to require relief under RCr 11.42 (specifically, a claim of ineffective assistance of counsel) or CR 60.02. *Id.*

### b. Appellant Was Not Entitled to an Evidentiary Hearing to Examine Whether the Commonwealth Acted in Bad Faith.

In the alternative, Appellant asks this Court to remand this case to the trial court for an evidentiary hearing to determine whether the missing evidence was lost or destroyed in bad faith. Appellant cites no authority for this request.

The United States Supreme Court has held that a criminal defendant's due process rights can be violated by "failure to preserve potentially useful evidence" but only where "a criminal defendant can show bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). But such claims usually arise in the course of trial, where the defendant has access to some discovery mechanisms, can demonstrate the police's bad faith if there is evidence of it, and has the protection of the full panoply of due process rights, including the right to material evidence under *Brady v. Maryland*.

The issue in this case has only arisen in the course of a post-conviction collateral attack. As this Court recently noted, "a person already convicted in a fair trial cannot claim the same liberty interest as a person first standing trial." *Bowling*, ___ S.W.3d at ___, 2010 WL 3722283, at * 3 (citing *Osborne*, 129 S. Ct. at 2320). "As such, a convicted person is not entitled to the 'familiar preconviction trial rights' in pursuit of a 'postconviction liberty interest.' Trial rights, such as the one to disclosure of exculpatory evidence in *Brady v. Maryland*, 373 U.S. 83 . . . (1963), are simply inapplicable in the postconviction setting." *Id.* (quoting *Osborne*, 129 S.Ct. at 2319); *see also Osborne*, 129 S.Ct. at 2320 ("*Brady* is the wrong framework."). Thus, it is questionable whether Appellant can even litigate a due process claim related to bad faith loss or destruction of evidence in the post-conviction context.

Even assuming that such a claim can be made, Appellant has not met his initial burden, regardless of whether we assume that the issue is raised under KRS 422.285 or if we, as the circuit court did, treat this part of

28

Appellant's petition as a CR 60.02 motion (or another collateral attack procedure). The DNA testing statutes are a mechanism for seeking DNA testing (and possibly claiming exculpation after such a test) and nothing more. Relief for tangentially related claims, such as the loss of evidence, must be sought under another procedural mechanism. And to the extent that Appellant's motion can be construed as one under CR 60.02, the trial court was not required to give him a hearing at which he *might* discover that the police acted in bad faith in losing the shoes and pants. The burden is on the Appellant to present evidence of bad faith before he can claim a due process violation in such a proceeding (and, then, only to the extent that he can claim a limited due process right). So far, he has not even alleged that the evidence was lost or destroyed in bad faith, having only hinted at the possibility of a grand conspiracy to hide the evidence after the motion for DNA testing was granted. What evidence the circuit court did have—an extensive search for the items similar to that discussed in *Taylor*, 291 S.W.3d at 695 (citing *Arey v. State*, 929 A.2d 501 (Md. 2007)), and that more than a dozen other items, including other clothing, were found and available for testing—supported a finding only of good faith. Appellant is not entitled to an evidentiary fishing expedition to satisfy his curiosity. *See id.* ("Obviously, the Commonwealth merely made a mistake in incorrectly transcribing the list of remaining evidence. Thus there is no valid argument that there was improper destruction of evidence regarding the swab.").

## 2. Appellant Is Not Entitled To A New Trial Simply Because Another Person's DNA Was Found On Clothing Worn By The Killer.

Appellant also claims that he should be granted a new trial because another person's DNA was found on some of the clothing worn by the killer. In making this claim, Appellant emphasizes that his theory of the case has always been that another person, Kenny Blair, committed the crime; that substantial evidence supports this claim; and that as a result, the question of the identity of the killer is of paramount concern. He basically argues that the results showing the presence of another person's DNA are "favorable" to him and thus require reversal of his conviction and sentence under KRS 422.285. He also claims that executing him in the face of "a truly persuasive claim of actual innocence" would violate the Eighth Amendment.

Though a trial court can vacate the conviction, among other things, "if the results of the DNA testing and analysis are favorable to the petitioner," KRS 422.285(9), such action was not required in this case. The problem with Appellant's claim is that the DNA results here were not "favorable" to him. Though the tests demonstrated the presence of another person's DNA, they did not exclude his DNA. [9] Much like in *Bowling*, "even if someone else's DNA was found on the [clothing], this would not exonerate Appellant, and even with an

---

[9] Moreover, the DNA found on the clothes has not yet been compared to anyone other than Appellant. No sample has been taken from Kenny Blair, nor is it likely that one can be procured, since he died in 1995 and was cremated. Appellant claims in his brief, however, that one of Blair's relatives has agreed to give a DNA sample and that a relative sample, while not perfectly capable of demonstrating that Blair was the source of DNA, can still produce significant results. That claim, however, does not appear to have been litigated at the circuit court, and this Court therefore cannot pass on the validity of such a comparison.

30

alternate perpetrator theory, the presence of someone else's DNA would not necessarily be exculpatory." *Bowling*, ___ S.W.3d at ___, 2010 WL 3722283, at *6. The clothes admittedly did not belong to Appellant originally, and thus had likely been worn by someone else. Additionally, they had been left in a pile of other people's laundry. Worse still, having first been collected prior to the use of DNA testing, it is unlikely that any precautions were taken to prevent contamination of the evidence, and it is likely that the evidence has been handled by many people, including trial counsel, since then. These scenarios could explain the presence of another person's DNA on the clothing.

Favorable results, at least in this scenario, would most likely require that Appellant be excluded as a source of DNA on the clothing, which would then demonstrate that he could not have worn them. *Cf. Bedingfield v. Commonwealth*, 260 S.W.3d 805, 814-15 (Ky. 2008) (ordering new trial where DNA evidence showed that semen in rape case was not from defendant). The circuit court noted this in its June 22, 2006 order. This focus on excluding Appellant, rather than showing the presence of another person's DNA, was proper.

Additionally, the other evidence of Appellant's guilt as recounted by the trial court undermines what little favorableness could be gleaned from the presence of another person's DNA. Thus, without test results showing the absence of Appellant's DNA on the clothing, the mere presence of another person's DNA on the items would not be favorable. *See Bowling*, ___ S.W.3d at ___, 2010 WL 3722283, at *6. ("Where there is enough other incriminating

31

evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt.'" (quoting *Osborne*, 129 S.Ct. at 2316)).

Moreover, it is not even clear that a test excluding Appellant would demonstrate his innocence. As Appellant himself has made much of, the biological materials on the evidence in this case have degraded over the last 30 years, making basic DNA testing unhelpful. While advanced testing, such as Y-STR, might prove helpful, any results from such tests excluding Appellant would have to be evaluated in light of the degradation of the samples. In other words, that Appellant appears to be excluded could be a function of the degradation of the evidence rather than his innocence. Of course, the opposite could be true. No doubt, a court would need the assistance of expert testimony to navigate the bramble that such results would present.

As for the claim that executing an innocent person would violate the Eighth Amendment, it is enough to note that the DNA evidence has thus far failed to demonstrate Appellant's innocence.[10] This is especially the case since

---

[10] As for the existence of such a right, the United State Supreme Court has stated:
> As a fallback, [the defendant] also obliquely relies on an asserted federal constitutional right to be released upon proof of "actual innocence." Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet. In this case too we can assume without deciding that such a claim exists, because even if so there is no due process problem.

*Osborne*, 129 S. Ct. at 2321-22 (citations omitted).

32

the "threshold showing" for any right to demonstrate innocence is "extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). Moreover, as to the claim that an Eighth Amendment right to demonstrate innocence, should it exist, requires further DNA testing beyond that required by KRS 422.285, we note that we have already held that no such additional right to DNA testing exists because it is merely a due process right that is satisfied by the statutory mechanism in place. *See Bowling*, ___ S.W.3d at ___, 2010 WL 3722283, at *4 ("Appellant also argues that he is entitled to DNA testing under the Eighth Amendment, which he claims includes a right against the execution of an innocent person. He argues that DNA testing, which might demonstrate his innocence, is necessary to vindicate this Eighth Amendment right. First, '[w]hether such a federal right [to be released upon proof of actual innocence] exists is an open question,' which the Supreme Court declined to decide in *Osborne*. Second, and more importantly, because this claim is one for a procedure needed to effectuate another right, it is actually a due process claim, where the substantive right (or liberty interest) to be protected stems from the Eighth Amendment. As noted above, there is no substantive due process right to DNA testing, nor is there a procedural due process right to anything beyond what KRS 422.285 currently provides. The absence of a federal constitutional right to postconviction DNA evidence forecloses [Appellant's] Eighth Amendment claim, which rested upon his due process argument.'" (quoting *Osborne*, 129 S.Ct. at 2316; *Young v. Philadelphia County Dist. Attorney's Office*, 341 Fed.Appx. 843, 846 (3d Cir. 2009)).

### 3. A Circuit Court Can Order Outside Testing Under KRS 422.285.

Appellant argues that the trial court erred by failing to order more advanced testing of the items by an outside lab and by failing to release the items to him so that he could pursue independent testing on his own. He also argues that disallowing the outside testing violates due process. Because these issues are at least interrelated and are, to some extent, actually the same claim, we address them together.

Appellant asked the trial court to allow testing by an outside laboratory, Orchid Cellmark Laboratory, because it could perform the more advanced Y-STR form of DNA testing that the KSP Laboratory is not equipped for.[11] Though the Commonwealth opposed this motion quite vigorously, Orchid Cellmark is, ironically, a contractor for the KSP Laboratory and has been used by the KSP Laboratory to perform testing in the past. *See Taylor*, 291 S.W.3d at 694 (noting that the Commonwealth sent a sample to Orchid Cellmark for STR testing in that case). Of course, Appellant also later complained about whether Orchid Cellmark was a reliable laboratory, though he does not appear to have maintained those concerns on appeal.

Nevertheless, the trial court held that it did not have any authority to order DNA testing by an outside laboratory. In reaching that conclusion, the court relied on KRS 422.285, 17.176, and 524.140. The court also declined to order the release of the evidence to Appellant, because ordering independent testing was beyond its power (since release of the evidence was simply a way to

---

[11]As discussed above, Appellant also asked for mitochondrial DNA testing, though his later trial motions focused on Y-STR testing.

34

obtain independent testing) and the motion was filed after its jurisdiction had ceased.

KRS 422.285, of course, lays out the main procedures for obtaining post-conviction DNA testing in capital cases. Most of the statute's requirements are discussed in *Bowling* and need not be reconsidered here, since the circuit court already ordered testing pursuant to the statute and the testing was performed to the extent possible.

KRS 17.176 does a number of things related to the testing process laid out in KRS 422.285. First, as noted in *Bowling*, it imposes additional requirements on a petition under KRS 422.285 (and 422.287). *See* KRS 17.176(1) ("In addition to the requirements specified in KRS 422.285, any evidence submitted for testing and analysis pursuant to KRS 422.285 or 422.287 shall . . . ."). These additional requirements are not at issue here. However, the other sub-sections of KRS 17.176 are germane to this case. Subsection (3) states,

> The defense, with a court order issued pursuant to this section, may submit not more than five (5) items of evidence for testing and analysis by the Department of Kentucky State Police forensic laboratory or another laboratory selected by the Department of Kentucky State Police forensic laboratory without charge. The cost of testing and analysis of any item of evidence in excess of the five (5) initial items to be tested and analyzed shall be borne by the agency or person requesting the testing and analysis. Any additional item of evidence submitted for testing and analysis shall be accompanied by the court order specified in subsection (1) of this section.

KRS 17.176(3).[12] The circuit court read this as requiring that any testing be done by the KSP Laboratory or its designee. In support of this conclusion, the court noted that KRS 524.140 regulates the KSP Laboratory's conduct in handling and keeping evidence that might be tested for DNA and emphasizes that such evidence should not be mishandled or destroyed.[13]

Were these provisions the only applicable ones, the circuit court's reading of them as limiting its power might be reasonable.[14] The circuit court, however, overlooked other provisions, specifically, a catch-all in KRS 422.285. Subsection (7) of that statute states, "The court may make *any other orders that the court deems appropriate,* including designating any of the following: (a) The preservation of some of the sample for replicating the testing and analysis;

---

[12] Subsection (2) reads similarly, but applies to the prosecution. Subsection (4) also reads similarly, but applies to "[a]ny other party in a criminal case, with permission of the court after a specific showing of necessity for testing and analysis, together with the items specified in subsection (1) of this section" and requires that the party pay for the testing.

[13] The Commonwealth also cites KRS 422.287, which states that testing under that statute shall be done by the Department of Kentucky State Police laboratory or at another laboratory selected by the Department of Kentucky State Police laboratory." KRS 422.287(3). That statute, however, applies only to a situation where "*a person is being tried for a capital offense* and there is evidence in the case which may be subjected to deoxyribonucleic acid (DNA) testing and analysis." KRS 422.287(1) (emphasis added). Basically, the statute applies only to pre-conviction testing, usually prior to trial, and its requirements do not control post-conviction proceedings under KRS 422.285.

[14] Of course, such a reading does not take into account Appellant's argument that the courts have the inherent power, under Section 109 of the Kentucky Constitution, to order outside testing, release evidence, etc. Given this Court's resolution of the matter under the statutes, however, it need not address Appellant's constitutional claim. We note in passing, however, that DNA testing has been allowed by trial courts, without substantial challenge by the Commonwealth, in even some non-capital cases, for which there is not specific statutory authorization. *See, e.g., Bedingfield v. Commonwealth,* 260 S.W.3d 805 (Ky. 2008) (discussing the effect of post-conviction DNA testing used to support a motion for a new trial and reversing because the DNA testing excluded the defendant).

36

and (b) Elimination samples from third parties." (Emphasis added.) This is a fairly broad power and clearly anticipates, in subsection (a), that the initial test by the KSP Laboratory may not be the end of the story.

In fact, at least one other provision, KRS 524.140(5)(c), anticipates the possibility of independent testing, at least after the initial KSP Laboratory testing. KRS 524.140(5) notes that DNA testing "consumes and destroys a portion of the evidence or may destroy all of the evidence if the sample is small." To that end, subsection (5) bars liability for the destruction of evidence in the testing process under certain conditions, including "[i]f the Department of Kentucky State Police laboratory knows or reasonably believes that so much of the biological material or evidence may be consumed or destroyed in the testing and analysis *that an insufficient sample will remain for independent testing and analysis* that the laboratory follows the procedure specified in paragraph (b) of this subsection." KRS 524.140(5)(c) (emphasis added).

The broad power given to the circuit court by KRS 422.285(7) when considering a capital post-conviction DNA petition, especially in light of the explicit mention of "independent testing" in KRS 524.140(5)(c), means that KRS 17.176 cannot be read as the circuit court did in this case. Instead, KRS 17.176 is primarily about two things: imposing a "probativeness" requirement, KRS 17.176(1), and designating who pays for DNA testing that is done by the KSP Laboratory, KRS 17.176(2) – (5). Certainly, the statute anticipates that testing will ordinarily be done by the KSP Laboratory or its designee, and may even evince a preference that testing be done there, but it does not impose a

37

limit on who may test, nor does it require that testing be performed by the KSP Laboratory or a lab of its choice in all cases. Instead, whether to order independent or outside testing falls within the sound discretion of the circuit court.[15] To the extent that the circuit court ruled that it had no power to order such testing, it erred as a matter of law.

This is not the end of the inquiry, however. In addition to ruling that it had no power to order independent testing, the circuit court also stated in its June 22 order that "there has been no allegation of fault or bias on the part of KSP that would persuade the Court to consider a change not specifically authorized by statute." In so stating, the court implied that even if it had the power to order outside testing, it would not have done so absent a showing of bias or fault on the part of the state. Such a showing, however, is not required, though the court may certainly consider fault or bias as a factor in deciding whether to order independent testing. The only limit on the court's power to order outside testing is that it may do so only if it "deems [such testing] appropriate." KRS 422.285(7).

Such testing may be appropriate for a number of reasons other than the presence of fault or bias. For example, the KSP Laboratory may have a backlog of work that would prevent it from complying with the court's order to perform

---

[15] Interestingly, this Court has already had a case in which independent testing was requested, specifically because the state's chosen laboratory could not perform the requested testing. *See Taylor*, 291 S.W.3d at 694. In that case, the circuit court ordered the state lab to send evidence to Bode Technology Group for "mini STR testing," which is apparently yet another form of advanced STR testing, after the state's contractor, Orchid Cellmark Laboratory, was unable to get results using "standard STR testing."

DNA testing in a reasonably speedy manner. Or, as was the case here, the KSP

Laboratory and its designees may simply not be equipped to perform the type of

testing requested by the DNA petitioner, even though the court believes the

alternative testing is valid enough to satisfy the *Daubert* requirements.

Of course, the mere fact that alternative or more advanced DNA testing is

available at an outside laboratory does not mean that a circuit court is required

to order it, especially where so-called standard DNA testing has already been

performed, as was the case here. A KRS 422.285 petitioner must demonstrate

that the requested alternative testing is better suited to demonstrating the

truth given the circumstances of the evidence than the standard DNA testing

performed by the KSP Laboratory. This concern is driven by the fact that

certain types of DNA testing appear to be useful only in certain circumstances.

For example, Y-STR testing, which has been requested in this case, appears to

have limited usefulness in identifying someone by a DNA match, but it may be

useful for excluding a person. *See, e.g., State v. Calleia*, 997 A.2d 1051, 1063-

64 (N.J. Super. Ct. App. Div. 2010).[16] Appellant, of course, argued to the trial

---

[16] The New Jersey court explained the usefulness and limits of Y-STR testing as
follows:

> Autosomal STR DNA analysis is problematic, however, when forensic
> scientists are confronted with a mixed DNA sample. For example, blood
> stains found at a crime scene may be the result of bleeding by both the
> victim and the perpetrator. An autosomal STR DNA profile generated
> from the stains will have a combination of both individuals' DNA patterns
> and it is not possible to attribute which traits go with which person.
> Further, one individual's profile often overwhelms the other and renders
> it un-detectible. When one individual is male and one is female, however,
> it is possible to perform a Y-STR DNA analysis and focus solely on the
> DNA of the male. Thus, the strength of Y-STR DNA testing derives from
> the fact that only males have a Y chromosome. Unfortunately, that fact is
> also the source of the test's weakness.

39

court the Y-STR testing would be useful in this case for purpose of exclusion, but such a claim must be supported by expert proof about the usefulness of the proposed testing.

The question, then, is whether the circuit court abused its discretion in nevertheless denying the outside testing. Though we are reluctant to do so, this Court concludes that the circuit court did abuse its discretion in a limited fashion. A court abuses its discretion when, among other things, its "decision . . . was unsupported by sound legal principles." *Miller v. Eldridge*, 146 S.W.3d 909, 914 (Ky. 2004) (quoting *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)). This includes "'application of the wrong legal principle,'" *id.* at 915 n.11 (quoting *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168-69 (2nd Cir. 2001)), or the "wrong legal standard," *id.* at 921.

---

Because only males possess Y chromosomes, a mother does not contribute to the genetic code of her son's Y chromosome. The DNA sequence on the Y chromosome is passed in complete form from grandfather, to father, to son and on down the male lineage. The Y chromosome loci are not independent of one another and there is no recombination of DNA. It is strictly a male marker and there is no randomness on the chromosomes. Consequently, the product rule used to generate probabilities for autosomal STR DNA analysis is inapplicable to Y-STR DNA analysis. In other words, barring random mutations, all men in a paternal lineage will possess the same Y-STR DNA profile. Thus, fathers, sons, brothers, uncles, and paternal cousins cannot be distinguished from one another through a Y-STR DNA profile.

For this reason, Y-STR DNA testing has limited usefulness in positively identifying an individual. The testing is extremely useful, however, in excluding someone since an individual cannot be the source of the DNA if the profiles do not match. If the Y-STR DNA profiles do match, then all that can be said is that the individual *cannot be excluded* as the DNA donor.

*State v. Calleia*, 997 A.2d 1051, 1063-64 (N.J. Super. Ct. App. Div. 2010).

40

The circuit court in this case applied the wrong legal standard in two ways. First, it concluded that it did not have the power to order independent testing, which no doubt forestalled its full consideration of whether such testing was appropriate in this case. And, second, it limited its alternative consideration, even in the face of the presumed lack of power to order independent testing, to whether the KSP Laboratory was biased or at fault. As noted above, the circuit court may, and indeed should, also consider other factors in deciding whether to allow independent testing.

This does not mean, however, that this Court will, or should, order independent testing at this point. As noted above, the discretion to make that decision lies initially with the circuit court, which is better equipped to evaluate the totality of the circumstances. Thus, it is necessary to remand this matter to the circuit court to consider Appellant's requests for independent testing in light of the factors outlined above and any other factors that the circuit court deems appropriate. At a minimum, this will require proof from Appellant that the requested alternative DNA testing can show something more than has already been shown by the normal testing already done by the KSP Laboratory. The Appellant's assertions about the utility of such testing alone are insufficient; some expert proof is also required.

This analysis also applies to the circuit court's decision whether to order the release of evidence for testing directly to a party. Unless it violates some other statute, the broad power in KRS 422.287(7) would include ordering the release of evidence. However, there are usually better options that avoid the

41

possibility that a petitioner, into whose possession the evidence would fall, could damage the evidence, even in the face of laws against tampering with evidence. The most obvious—and clearly superior—alternative would be to order the KSP Laboratory to send the materials directly to the outside laboratory that the petitioner wants to perform the test. Presumably, such an outside laboratory will have sufficient protocols in place to maintain the integrity of the evidence. And if it does not, then that factor should weigh heavily in the circuit court's initial decision whether to order testing at such a facility.

One additional, somewhat delicate question about preserving evidence remains. As noted above, KRS 524.140 imposes a number of requirements on the KSP Laboratory, all of which are aimed at preserving evidence. This statute appears only to bind the KSP Laboratory, and not an outside laboratory. Presumably, since several statutes note that the KSP Laboratory may employ an outside laboratory, e.g., KRS 17.176(2), (3), (4) ("or another laboratory selected by the Department of Kentucky State Police forensic laboratory"), the requirements of KRS 524.140 would apply with equal force to any outside laboratory acting as the agent of the KSP Laboratory. This may counsel in favor of a circuit court ordering so-called independent testing to be done by a laboratory that already contracts with the KSP Laboratory, rather than a true outsider, especially since that prior relationship could also be a proxy for the outside laboratory's reliability. That would make this case easy, since the

Appellant has asked for exactly that: testing by an outside laboratory that already works for the KSP Laboratory.

However, even if the court were to choose a laboratory that does not have an existing relationship with the KSP Laboratory, the court could alleviate most concerns by simply incorporating the requirements of KRS 524.140 into its order.

Finally, because this court is remanding the case to the circuit court, its earlier ruling that it had no jurisdiction to consider the earlier motion to release the evidence is rendered moot, since that court will regain jurisdiction. Should Appellant make a timely motion for release of the evidence on remand, the court should consider it. This Court also notes, however, that the trial court retained jurisdiction to rule on Appellant's motion because his motion to proceed in forma pauperis had not yet been decided, meaning his notice of appeal had been tendered but was not considered "filed." *See* RCr 72.02(1)(b) ("If timely tendered and accompanied by a motion to proceed in forma pauperis supported by an affidavit, a notice of appeal or cross-appeal shall be considered timely but shall not be filed until the motion to proceed in forma pauperis is granted or, if denied, the filing fee is paid.").

## B. The Commonwealth's Cross-Appeal

In its cross-appeal, the Commonwealth argues that laches bars all of Appellant's claims; that the trial court erred in ordering any DNA testing; that the trial court erred in denying its motion to reconsider the order to test the pants and shoes that were eventually found to be lost; that the trial court erred

43

in not requiring Appellant to submit to DNA testing; and that the trial court erred in allowing Appellant to submit a self-collected DNA sample. We address each claim in turn, to the extent necessary.

### 1. Laches Does Not Bar Appellant's KRS 422.285 Petition.

The Commonwealth claims that Appellant's entire request for DNA testing under KRS 422.285 should have been barred by the equitable doctrine of laches. The DNA testing statutes were enacted in 2002, see 2002 Ky. Acts. ch.154, §§ 1-10, but Appellant did not file his petition until 2006, several months after the Sixth Circuit resolved his federal habeas action and only a few days after the Attorney General requested that the Governor issue a death warrant for Appellant's execution. The Commonwealth alleges that this timing was not a coincidence and was actually part of a concerted effort at delay, which should bar the claim under laches.

This Court will not apply the doctrine of laches to claims under the post-conviction DNA testing statute. Not only does the statute not include a limitation period, as most collateral attack procedures do, see, e.g., RCr 11.42 (requiring most filings within three years), the statute specifically says that a petition can be filed "[a]t any time" after conviction of and sentencing to death for a capital offense, KRS 422.285(a). This reflects a policy decision by the General Assembly to allow death row petitioners to seek DNA testing even at a late date. It is not clear that this—or any—court should act in chancery in direct contravention of a statutory mandate.

44

But this Court need not decide the wisdom of employing its equitable powers in this situation, as the Commonwealth has not shown the required elements of laches. "[T]his doctrine serves to bar claims in circumstances where a party engages in unreasonable delay to the prejudice of others rendering it inequitable to allow that party to reverse a previous course of action." *Plaza Condominium Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996). If no limitation period has passed, and presumably where there is no such period, "one claiming a bar based on delay must also show prejudice." *Id.*

The Commonwealth claims prejudice to its interest in the finality of judgments and from the deterioration of DNA on the evidence between 2002 and 2006, but neither claim is convincing. If finality of judgments is the type of interest that can be prejudiced by delay, then almost every collateral attack on a judgment or final order would fail under the doctrine. The doctrine of laches applies mostly to claims that might result in a judgment or order that decides the rights and obligations of the parties.

While finality of judgments is obviously an important interest, it only comes into play after the rights of the parties have been decided, and therefore should not be grounds for invoking laches. And any prejudice that might result from deterioration of the DNA during the delay will affect the petitioner more than the Commonwealth, since he bears the burden post-trial of demonstrating innocence or some lesser exculpation. Any deterioration makes that burden all the more difficult on a petitioner. As such, this Court discerns

45

no actual prejudice to the Commonwealth and will not resort to laches to bar Appellant's claim.

Finally, to the extent that the Commonwealth claims a specific interest in the execution of death sentences, it seems that any prejudice here is minimal and is outweighed by the Commonwealth's concomitant duty to pursue justice and serve the law, which is owed to everyone in this Commonwealth, including criminal defendants and convicted persons. *Cf. Berger v. United States*, 295 U.S. 78, 88 (1935) ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.").

Moreover, it is not even clear that a KRS 422.285 petition will necessarily cause any delay, since the filing of a petition does not work to stay an execution. Rather, a specific order from the court, or an appellate court, would be required. Without such an order, the filing of a petition would have no effect and would become, in essence, a race against the clock. And in deciding

46

whether to issue such a stay order, a court is free to consider any delay in filing and look into whether the petitioner intentionally sat on his rights, filed only as a delay tactic (e.g., when an execution has already been scheduled), or any other relevant factor.

## 2. The Circuit Court Did Not Err in Ordering Testing.

The Commonwealth also argues that the trial court erred in ordering DNA testing at all in this case. In support of this, the Commonwealth claims that there was no reasonable probability that Appellant would not have been prosecuted or convicted if exculpatory DNA results had been obtained. The Commonwealth also complains that the trial court should have been required to make individual findings as to each piece of evidence to be tested, which was not done in this case.

To the extent that this argument is aimed at the testing that has already been done, it is moot. The testing cannot now be undone, nor should the results of the testing be ignored by a court if they are probative of innocence or otherwise favorable to the Appellant, even if ordered in error. *Cf. Bowling*, __ S.W.3d at __, 2010 WL 3722283, at *6 ("[I]t is questionable whether the trial court was correct in allowing DNA testing in the first place, but if the decision is error, it is harmless.").

To the extent that the trial court may order additional testing based on its previous findings on remand, however, this Court concludes that its findings are not clearly erroneous. The trial court found both a "reasonable probability" that Appellant would not have been prosecuted or convicted if

47

exculpatory results had been obtained through DNA testing and analysis under KRS 422.285(2)(a), and that the verdict would have been more favorable if the DNA results had been available at trial under KRS 422.285(3)(a). The Commonwealth presumes that the favorable results would at best show that Kenny Blair contributed DNA to clothes.

But evaluating that claim now, before such "favorable findings" have been returned, is premature. Moreover, favorable results could also have excluded Appellant completely.[17] In light of this simple logic, and the totality of the record, this Court concludes that the circuit court's findings were supported by substantial evidence and were not clearly erroneous.

Also, this Court concludes that a circuit court need not necessarily make separate findings for each piece of evidence to be tested. The Commonwealth's concern here, of course, is that a blanket finding by the trial court might allow testing of an overwhelming number of items. The easy solution, of course, is to allow the trial court to limit the number of items to be tested. Or, if the trial court chooses, it can make findings as to specific items of evidence and conclude that some should be tested and others not tested. These decisions, too, fall within the sound discretion of the trial court.

Finally, this Court need not now engage in an extended discussion of how KRS 422.285 and 17.176 should work, as it has recently provided the

---

[17] Indeed, the circuit court noted in its June 22, 2006 order requiring testing that exclusion of Appellant is the main thrust of this case. This properly narrowed the scope of the initial testing to be done and helps frame the Appellant's required showing on remand about the utility of alternative testing, which must be able to demonstrate exculpation in some degree, which the testing performed so far has failed to do.

lower courts and the bar such guidance. *See Bowling*, __ S.W.3d at __, 2010 WL 3722283, at *4-*5. The circuit court's proceedings in this case complied substantially with the requirements of those statutes, as interpreted in *Bowling*, and therefore were not erroneous.

### 3. The Circuit Court Did Not Err in Denying the Commonwealth's Motion to Reconsider Its Order to Test the Pants and Shoes.

The Commonwealth also argues that the circuit court erred by denying its motion to reconsider the order to test the pants and shoes that turned out to have been lost. The circuit court resolved this motion by ruling that it was moot after the pants and shoes were shown to be missing. This Court agrees. Given that compliance with the order was literally impossible and, as a result, the trial court declared it moot, it is clear that the Commonwealth was not even aggrieved by the order.

However, that the Commonwealth has raised this issue provides an opportunity for this Court to comment on a point of civil procedure. The Commonwealth appeals the denial of a so-called motion to reconsider, which the circuit court noted "recite[d] arguments that . . . [it had] rejected on two prior occasions and the [c]ourt [wa]s not inclined to re-visit . . . without case law authorizing it to do so." Motions such as this merely asking the trial court to change its mind have become a very common practice in the circuit courts of this Commonwealth, and indeed several such motions, from both sides, were filed in this case.

49

Such repetitious motions are improper. While it is true that under CR 54.02 the trial court retains broad discretion to revisit its interlocutory rulings at any time prior to the entry of a final judgment, that discretion is properly invoked only when there is a *bona fide* reason for it, *i.e.,* a reason the court has not already considered. *See Tax Ease Lien Investments 1, LLC v. Brown,* 340 S.W.3d 99 (Ky. App. 2011); *Bank of Danville v. Farmers National Bank of Danville,* 602 S.W.2d 160 (Ky. 1980). Otherwise a motion to reconsider amounts to no more than badgering the court, a practice that could well be deemed a violation of Civil Rule 11. The bench and bar are admonished to take notice that this practice of filing multiple vexatious motions to reconsider is not supportable under the Civil Rules and should be discontinued.

### 4. The Trial Court Did Not Err in Dealing With Appellant's DNA Sample.

Finally, the Commonwealth claims that the trial court erred in not requiring the Appellant to submit a DNA sample and by later allowing testing of Appellant's self-collected sample. Whether and when to order the collection of a sample of a KRS 422.285 petitioner's DNA also falls within the sound discretion of the trial court. So, too, does allowing the testing of a self-collected sample submitted by a petitioner's counsel. While this latter practice may not be the best one, since it presents a greater possibility for mischief, this Court is convinced that a trial court is sufficiently cognizant of the risks of such self-collection to take steps to minimize them.

For example, the court could require that Appellant's counsel procure the sample and submit it as an officer of the court. Indeed, that appears generally

50

to have happened in this case, though not pursuant to an order. And if such a self-collected sample leads to favorable DNA results, a circuit court could always order a petitioner to submit a new sample under the supervision of the KSP Laboratory or its agent for further testing as a hedge against possible shenanigans. We cannot say that the circuit court abused its discretion here, either in declining to order Appellant to submit a DNA sample at the time it was first requested or later allowing the use of his self-collected one. It is equally true that the trial court would have been within his discretion if he *had* ordered testing instead of accepting the self-collected sample. The point is that the trial court must manage the testing process, and we perceive no error concerning this.

### III. Conclusion

The circuit court did not err in refusing to vacate Appellant's conviction and sentence of death or in refusing to hold an evidentiary hearing, though it abused its discretion in its handling of Appellant's requests for independent DNA testing. The issues raised by the Commonwealth in its cross-appeal are without merit. For these reasons, the orders of the Jefferson Circuit Court are affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

Minton, C.J.; Abramson and Venters, JJ., concur. Cunningham, J., concurs in part and dissents in part by separate opinion in which Schroder and Scott, JJ., join.

51

CUNNINGHAM, J., CONCURRING IN PART AND DISSENTING IN PART:

Over thirty years ago, on August 10, 1979, in Louisville, Kentucky, 77-year-old Virgil Harris was leaving the A & P grocery store after buying bananas for his ice cream shop located on Seventh Street. Shortly before noon, as he was walking from the grocery store across the parking lot, he encountered the Appellant, Brian Keith Moore. Moore had been out of the penitentiary for less than two years, having served out on charges of first-degree robbery, second-degree assault, and escape. Moore abducted Mr. Harris at gunpoint and drove away in his 1978 maroon Buick to the Jefferson Hill Road. There, in a remote area, Moore pushed Mr. Harris down an embankment and fatally shot him four times in the head at close range. Moore stole Mr. Harris's watch and wallet, as well as his car. He then drove the victim's car to the home of his friends, Kenny Blair and Lynn Thompson, where he had stayed the night before. He brought with him a paper sack containing a money bag, a gun, a clip, and several rolls of coins. He even had the bananas.

How do we know all this? Because Brian Keith Moore has told us so several times. He confessed to Kenny Blair and Lynn Thompson, as well as three police officers. He also made incriminating statements in front of a correctional officer. According to the correctional officer, Moore bragged about killing a policeman's father, and he found Mr. Harris's final death throes humorous. We don't even have to take Moore's word for it.

The jury learned that a person meeting Moore's description had been observed abducting Mr. Harris. Moore was seen driving the victim's car. His

52

fingerprints were found inside the victim's car, as well as on a roll of coins taken from Mr. Harris. Moore was wearing the victim's wristwatch. There was gunpowder residue on Moore's hands. Soil samples on Moore's clothes matched that where the victim's body was found. Ballistics testing of the gun Moore was carrying matched up to the bullets which killed Mr. Harris.

Brian Keith Moore received two jury trials. The first case was reversed because the jury learned that his main alibi witness was an ax murderer.

I recount all of this history to remind ourselves of the overwhelming evidence of guilt against Moore and the long, tortuous road this case has taken. Two juries have given him the death penalty. Yet, here we are three decades after the murder of his elderly victim sending it back again for more findings by the trial court.

Justice Noble does her typically splendid job of covering all the complex issues raised in this case. In fact, as the reader will see, I glean much of her excellent writing to support my position. I part ways, however, with her and the majority regarding the issue of remanding the case back for further findings by the trial court concerning the DNA. The value of any evidence that can possibly be secured by another hearing is highly questionable. Says the majority through the writing of Justice Noble: "Moreover, it is not even clear that testing that excluded Appellant would demonstrate his innocence. As Appellant himself has made much of, the biological materials on the evidence in this case have degraded over the last 30 years, making basic DNA testing unhelpful."

In dealing with the new trial issue, the majority also states:

> Though the tests demonstrated the presence of another person's DNA, they did not exclude his DNA. (Footnote omitted). Much like in *Bowling*, "even if someone else's DNA was found on the [clothing], this would not exonerate Appellant, and even with an alternate perpetrator theory, the presence of someone else's DNA would not necessarily be exculpatory." (Citation omitted). The clothes admittedly did not belong to Appellant originally, and thus had likely been worn by someone else. Additionally, they had been left in a pile of other people's laundry. Worse still, having first been collected prior to the use of DNA testing, *it is unlikely that any precautions were taken to prevent contamination of the evidence, and it is likely that the evidence has been handled by many people, including trial counsel, since then.* These scenarios could explain the presence of another person's DNA on the clothing. (Emphasis added.)

Once again, I have to ask. Why are we sending it back for more findings to determine if there should be more testing? The logic escapes me. The majority makes it clear that any evidence of another person's DNA on the evidence would be of no consequence. I would only add that the dead Blair is the alternate perpetrator put forth by Moore. Since he was cremated, no positive match can be made, even through his nephew. At most, the only determination a test could show with complete certainty is whether the DNA on the evidence was from a person related to the nephew. *See generally* Frederick R. Bieber, Charles H. Brenner & David Lazer, FINDING CRIMINALS THROUGH DNA OF THEIR RELATIVES, 312 SCI. 1315 (2006); Henry T. Greely, Daniel P. Riordan, Naibaa' A. Garrison & Joanna L. Mountain, FAMILY TIES: *The Use of DNA Offender Databases to Catch Offenders' Kin* 34 J.L. MED. & ETHICS 248 (2006).

Also, Moore was living with Blair and his girlfriend at the time of the murder, and it would not be particularly startling for Blair's DNA to appear.

Yet, inexplicably we hold today that the trial court abused its discretion in failing to consider further testing. We are sending this case back on the very dubious and speculative grounds of wonder. We wonder what it might show.

The Commonwealth has carried its burden of proof for thirty years. Is it not reasonable to conclude that after all these years it might have been the burden of Moore to have shown what favorable results could be exculpatory by further testing? He has not done that.

While the trial Court did find that the requirement for DNA testing was met under KRS 422.285(2), no such finding was made as to the need for the special testing now being requested. Testing was ordered and conducted. Only the additional testing by Orchid Cellmark Laboratory for a more advanced Y-STR form of DNA testing was denied. And we hold in this very opinion that it is not required, at least as to Eighth Amendment claims: "[W]e note that we have already held that no such additional right to DNA testing exists because it is merely a due process right that is satisfied by the statutory mechanism in place." And, furthermore, we say: "Most of the statute's requirements are discussed in *Bowling* and need not be reconsidered here, *since the circuit court already ordered testing pursuant to the statute and the testing was performed to the extent possible.*" (Emphasis added.)

The advance of science in the area of DNA evidence is a welcomed tool in helping us discover the truth in criminal cases. This new technology should be

55

a means to justice, not an obstacle. Common sense has to dictate when that tool is meaningful.

This case stands in stark contrast to another DNA case we reversed just last month. That was the case of *John Roscoe Garland v. Commonwealth*, --- S.W.3d ----, Nos. 2009-SC-000035-MR and 2009-SC-000361-MR (Ky. May 19, 2011). *Garland* involved the murder of two people. However, the only evidence against Garland was the testimony of one person. That one incriminating person had a criminal record. Garland did not. Garland claimed it was the witness who committed the murders. Clutched in the hand of one of the victims was a clump of hair which did not match in color that of Garland. But it was the hair color of the incriminating witness and person accused by Garland. DNA testing was not available at that trial several years ago. But it is now. The determination of the owner of the hair found clutched in the dead victim's hand is pivotal to the guilt or innocence—yes, perhaps even the life or death—of Garland. I vigorously joined my other brothers and sisters on this Court in sending it back for DNA testing. Common sense dictated it.

Not so in this case.

I agree completely with the majority in finding that the trial court was in error in concluding that it was restricted to having the evidence examined by the Kentucky State Police Lab under KRS 17.176(3). Significantly, we are not sending the case back for retesting. We are sending it back for the trial court to *consider* Moore's request for retesting. The court has already considered it and denied it. Perhaps the additional testing was denied for the wrong reason,

but the denial was harmless for the following reasons: (1) as this Court has acknowledged, the 30-year-old evidence to be tested is degraded and contaminated substantially; (2) we have held that the presence of anyone else's DNA, especially in light of the age of the evidence, would not be exonerating; (3) positive DNA of Moore has never been found on the evidence and, therefore, no DNA evidence has ever been used to incriminate him; and (4) conclusions which might be reached by retesting that totally excluded Moore's DNA has no probative value. Such misreading of the statute by the trial court was obviously harmless because of our ruling in *Bowling*. The posture of this case makes any further examination unnecessary.

I need not remind this Court that, in a death penalty case, there is nothing cursory about a remand. Nor should there be. We will not likely see this case again for two years. What additional issues will be deposited upon our door step when we see it again is beyond our prophetic powers. As I stated in my opinion concurring in part and dissenting in part in *Bowling v. Kentucky Dept. of Corrections*—which is still out there somewhere awaiting our further consideration—"There is no end to the creative mind of the condemned." 301 S.W.3d 478, 493 (Ky. 2009).

If we have seen a decline and endless delays in the application of the death penalty in recent years, it is not at the behest of citizens of this state or of this nation. The death penalty, authorized by our democratically elected legislature and mandated by the electorate, is being slowly strangled by the

57

lack of common sense from both state and federal appellate courts. I am afraid that our decision today is another such example.

Therefore, I concur in all but the remand, to which I respectfully dissent.

Schroder and Scott, JJ., join.

COUNSEL FOR APPELLANT/CROSS-APPELLEE:

David Hare Harshaw, III
Assistant Public Advocate
Department of Public Advocacy
207 Parker Drive, Suite 1
LaGrange, Kentucky 40031

David Michael Barron
Department of Public Advocacy
Assistant Public Advocate
Capital Post Conviction Unit
100 Fair Oaks Lane, Suite 301
Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE/CROSS-APPELLANT:

Jack Conway
Attorney General

David Wayne Barr
Assistant Attorney General
Office of Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204

# Supreme Court of Kentucky

2008-SC-000860-MR
2008-SC-000925-MR
2008-SC-000957-MR

BRIAN KEITH MOORE                                    APPELLANT/CROSS-APPELLEE

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                    HONORABLE JAMES M. SHAKE, JUDGE
NO. 79-CR-000976

COMMONWEALTH OF KENTUCKY                      APPELLEE/CROSS-APPELLANT

## ORDER DENYING PETITION FOR REHEARING
## BUT MODIFYING OPINION

The Petition for Rehearing, filed by the Commonwealth of Kentucky, of

the Opinion of the Court, rendered June 16, 2011, is **DENIED**,

The Opinion of the Court rendered on June 16, 2011 is **MODIFIED** by

substitution of the attached Opinion in lieu of the original Opinion. Said

modifications do not affect the holding of the Opinion as originally rendered.

All sitting. All concur.

ENTERED: November 23, 2011.

CHIEF JUSTICE