Gregory WILSON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000573–MR.

Supreme Court of Kentucky.

May 24, 2012.

Daniel T. Goyette, Louisville Metro Public Defender, Bruce P. Hackett, Chief Appellate Defender, Leo Gerard Smith, Office of the Louisville Metro Public Defender, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Julie Scott Jernigan, Assistant Attorney General, Office of Criminal Appeals, Heather Michelle Fryman, Assistant

Attorney General, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

Gregory Wilson received the death sentence in 1988. In 2010, he moved the trial court to prohibit execution of the death sentence because of his mental retardation (mental retardation motion) and to compel deoxyribonucleic acid (DNA) testing of hairs and semen found in the victim's automobile and used by the prosecution in his 1988 trial (DNA motion). The trial court denied both motions in a single order without holding an evidentiary hearing on either of these motions. Wilson now appeals the trial court's order as a matter of right,[1] raising statutory and constitutional concerns.

Upon review, we hold that

1) the trial court erred in denying Wilson's mental retardation motion without an evidentiary hearing,

2) Kentucky's procedures for establishing whether capital offenders are mentally retarded do not violate Wilson's due process rights,

3) the trial court properly denied Wilson's motion for DNA testing of the hairs,

4) Wilson is not entitled to an evidentiary hearing to determine if the hairs are in existence or were destroyed after a preservation order,

5) the trial court erred by failing to rule on Wilson's request for DNA testing of the semen, and

6) Wilson is not entitled to DNA testing under the federal or state constitutions.

Accordingly, we

1) affirm the trial court's ruling on Wilson's motion denying DNA testing of the hairs,

2) vacate the trial court's order to the extent that it failed to rule on whether Wilson is entitled to DNA testing of the semen and remand this issue to the trial court for a ruling, and

3) vacate the trial court's ruling on the mental retardation motion and remand this issue to the trial court to conduct an evidentiary hearing on whether Wilson is exempt from execution because he is a mentally retarded offender.

## I. FACTUAL AND PROCEDURAL HISTORY.

A circuit court jury convicted Wilson based upon his participation in the 1987 murder, kidnapping, first-degree rape, first-degree robbery, and criminal conspiracy to commit robbery of Deborah Pooley. The trial court sentenced Wilson to death on the murder and kidnapping convictions and to consecutive prison terms of twenty, twenty, and ten years' imprisonment, respectively, for the first-degree rape, first-degree robbery, and criminal conspiracy to commit robbery convictions.

On direct appeal, this Court affirmed all of Wilson's convictions and sentences except for the kidnapping sentence, which this Court vacated and remanded for resentencing.[2] On remand, the trial court sentenced Wilson to the maximum sen-

---

**1.** Ky. Const. § 110(2)(b).

**2.** *Wilson v. Commonwealth,* 836 S.W.2d 872 (Ky.1992), *overruled by St. Clair v. Roark,* 10 S.W.3d 482 (Ky.1999) (overruling *Wilson's* holding that a double jeopardy violation oc-

curs in convicting a defendant of both the murder and the capital kidnapping of the same victim and imposing separate death sentences for each conviction).

tence for kidnapping as a Class A felony, life imprisonment. On the second direct appeal, this Court reversed and remanded the kidnapping sentence for resentencing by a jury unless the trial court imposed the minimum allowable sentence. Again, on remand, the trial court sentenced Wilson to twenty years' imprisonment.

In 1998, this Court affirmed the trial court's denial of Wilson's post-conviction motion to vacate his convictions under Kentucky Rules of Criminal Procedure (RCr) 11.42.[3] After exhausting his state remedies, Wilson filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Kentucky. The federal district court denied Wilson's petition, and a panel of the Court of Appeals for the Sixth Circuit affirmed.[4]

In April 2010, Wilson filed his mental retardation motion and DNA motion. While those motions were pending in the trial court, the Governor signed a warrant in August 2010 for Wilson's execution to take place in September 2010. And Wilson immediately moved the trial court for a stay of execution. The trial court denied Wilson's motions and refused to stay his execution. Wilson filed the instant appeal. During the pendency of this appeal, the September 2010 execution warrant expired.

## II. ANALYSIS.

### A. Mental Retardation Motion.

Wilson moved to set aside the death sentence, citing Kentucky Revised Statutes (KRS) 532.130–140 and the Eighth Amendment of the U.S. Constitution. KRS 532.140 prohibits the execution of seriously mentally retarded offenders. A *seriously mentally retarded offender* is defined as having "significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period."[5] And *significantly subaverage general intellectual functioning* means "an [I.Q.] of [70] or below."[6] Executing mentally retarded offenders is cruel and unusual punishment prohibited by the Eighth Amendment.[7]

Wilson argues (1) he is entitled to an evidentiary hearing on his mental retardation motion; (2) Kentucky's procedures for determining the mental retardation of capital offenders violate his due process rights; and (3) that in lieu of an evidentiary hearing, he is entitled to a new penalty phase trial. In response, the Commonwealth contends (1) Wilson waived his mental retardation claim, (2) the statutes KRS 532.130–140 do not apply post-conviction, and (3) Wilson did not carry his burden to require an evidentiary hearing.

We hold that Wilson did not waive his claim and that the statutes KRS 532.130–140 do apply post-conviction to capital offenders tried before the statutes' effective date of July 13, 1990. So Wilson is entitled to an evidentiary hearing on his mental retardation motion because he produced some evidence that he is mentally retarded. We remand the case to the trial court for that purpose. And, in light of that remand, Wilson's request for alterna-

---

**3.** *Wilson v. Commonwealth*, 975 S.W.2d 901 (Ky.1998).

**4.** *Wilson v. Parker*, 515 F.3d 682 (6th Cir. 2008).

**5.** KRS 532.130(2).

**6.** *Id.*

**7.** *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *See also Bowling v. Commonwealth*, 163 S.W.3d 361 (Ky. 2005) (holding that the constitutional right recognized in *Atkins* is retroactive).

tive relief in the form of a new penalty phase trial is rendered moot. We also find that Kentucky's procedures for determining whether a capital offender is mentally retarded do not violate Wilson's due process rights.

### 1. Wilson did not Waive his Mental Retardation Claim.

■ We reject the Commonwealth's contention that Wilson cannot raise his mental retardation claim because of delay, waiver, or the doctrine of laches.[8] Essentially, the Commonwealth asserts that Wilson unreasonably delayed bringing this claim and, therefore, should be barred from presenting it.

Kentucky enacted KRS 532.130–140 in 1990, after Wilson's 1988 conviction. And KRS 532.140(3) specifically states that the statutory scheme does not apply to trials commenced before July 13, 1990.[9] Because Wilson was convicted before KRS 532.130–140 became effective, he could not have procedurally defaulted on his mental retardation claim.[10]

We recognized in *Bowling* that absent procedural default, a capital offender's Eighth Amendment based claim that he is exempt from execution because of mental retardation "may be asserted at any stage of the proceedings, presumably up to the moment of execution."[11] So we hold that Wilson's mental retardation motion is timely because KRS 532.130–140 did not apply to his trial, and he has not had the opportunity to adjudicate his claim.

### 2. KRS 532.130–140 Apply to Post–Conviction Proceedings.

■ We also hold that the trial court should use KRS 532.130–140 to resolve Wilson's mental retardation motion. The Commonwealth argues that the trial court lost the jurisdiction to rule on Wilson's mental retardation motion because there is no statute or rule granting the trial court this power post-conviction. Instead, the Commonwealth would apply the procedure for determining an offender's sanity before

---

**8.** *Laches* is defined as "[t]he equitable doctrine by which a court denies relief to a claimant who has unreasonably delayed in asserting the claim, when that delay has prejudiced the party against whom relief is sought." BLACK'S LAW DICTIONARY (9th ed.2009).

**9.** The dissent claims that despite the fact that KRS 532.130–140 was enacted after Wilson's trial, "for over twenty-two years since its enactment, this remedy has been available to him in his post-trial litigation." But the text of KRS 532.140 prohibits the statutory scheme from applying to Wilson's trial, which commenced before July 13, 1990. And the United States Supreme Court did not recognize an Eighth Amendment prohibition on executing mentally retarded offenders until 2002 in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Not until 2005, in *Bowling v. Commonwealth*, 163 S.W.3d 361 (Ky.2005), did this Court hold that the Eighth Amendment right is retroactive. Wilson's federal habeas corpus proceed-

ings concluded in 2009. And Wilson filed his mental retardation motion in 2010. We fail to see how Wilson, "by his failure to raise the mental retardation issue since the enactment of KRS 532.130–140 in 1990, has waived such relief."

**10.** *See Skaggs v. Commonwealth*, 330 S.W.3d 52, 53 (Ky.2005) ("Appellant's original trial was held prior to the effective date of the exemption statutes; thus, he could not have procedurally defaulted the mental retardation issue.").

**11.** *Bowling*, 163 S.W.3d at 370 ("Appellant did not raise the issue during normal collateral review even though *Atkins* was decided six months before oral argument was held on his habeas appeal to the Sixth Circuit. Nevertheless, the courts that have considered the issue apparently agree that the claim may be asserted at any stage of the proceedings, presumably up to the moment of execution.") (citations omitted).

execution under KRS 431.2135.[12] We disagree.

In *Bowling*, this Court indicated that a Kentucky Rules of Civil Procedure (CR) 60.02 motion is an appropriate vehicle to address post-conviction mental retardation claims.[13] Although Wilson's motion does not specifically reference CR 60.02, we choose to treat it as proper because this is a death penalty case.[14] So the trial court does have jurisdiction to hear Wilson's CR 60.02 motion.

And, in *Commonwealth v. Paisley*,[15] this Court impliedly approved of using KRS 532.130–140 to decide mental retardation claims post-conviction. In *Paisley*, the offender was convicted in 1980.[16] Following *Atkins*, he filed a motion to set aside his death sentence on the grounds that he was mentally retarded.[17] We approved of the trial court's order for mental health testing, stating that the offender "never had an opportunity to assert and prove entitlement to this mitigator. Accordingly, it was no doubt proper for [the trial court] to order mental health testing for [the offender]." [18]

Wilson is seeking to enforce his right under the Eighth Amendment and is entitled to use KRS 532.130–140, statutes that this Court has found adequately protect capital offenders' constitutional rights.[19] And trial courts should use these statutes to determine whether a convicted offender is ineligible for the death penalty because he is mentally retarded when the claim is not otherwise procedurally defaulted.[20]

### 3. Wilson is Entitled to an Evidentiary Hearing.

■ The trial court denied Wilson's mental retardation motion without conducting an evidentiary hearing because it ruled that he did not meet the definition of a *seriously mentally retarded offender* under KRS 532.130. We disagree and find that Wilson is entitled to an evidentiary hearing on his mental retardation motion because he produced some evidence that he is mentally retarded.

As detailed above, to be considered a *seriously mentally retarded offender* ineligible for the death penalty, an offender must have an IQ of 70 or below existing concurrently with substantial deficits in adaptive behavior, both of which manifested during the offender's developmental period. "Not every defendant who claims to be mentally retarded is entitled to a hear-

---

12. We note that although KRS 431.2135 concerns post-conviction proceedings, it provides procedures for determining a capital offender's sanity, not for setting aside an offender's death sentence because of mental retardation. So if the Commonwealth's test for jurisdiction is a statute that specifically grants authority to determine mental retardation post-conviction, the trial court would not have jurisdiction under KRS 431.2315 either.

13. *Bowling*, 163 S.W.3d at 365; *See also White v. Payne*, 332 S.W.3d 45, 47 n. 2 (Ky. 2010).

14. *See Bowling*, 163 S.W.3d at 366 (Bowling filed an independent civil action under a CR 60.03 motion instead of a CR 60.02 motion. Although improperly filed, we chose to enter-

tain the motion as proper because it was a death penalty case.).

15. 201 S.W.3d 34 (Ky.2006).

16. *Id.* at 35.

17. *Id.* at 36.

18. *Id.* (citations omitted).

19. *Bowling*, 163 S.W.3d at 373 ("our statutory scheme is neither unconstitutional nor contrary to *Atkins* or any other United States Supreme Court precedent").

20. For further discussion of procedural default, see *Bowling*, 163 S.W.3d 361.

ing on the issue."[21] An offender must make at least a prima facie showing that he may be mentally retarded before he is entitled to an evidentiary hearing.[22] Specifically, "a defendant must produce some evidence creating a doubt as to whether he is mentally retarded."[23]

In support of his mental retardation motion, Wilson submitted school records indicating that at age 14, he had an IQ of 62; was reading at a third-grade level; and was performing work at a first- and second-grade level. The record refers to Wilson as "mildly retarded, immature + dependent" and "immature, naive, and easily influenced by delinquent peers."[24] But the record also states that "his adjustment to school should be no problem" and that he had "never been a truancy problem and gets along with teacher."

Denying Wilson's motion, the trial court found insufficient proof of substantial deficits in adaptive behavior, the second prong of the definition of *seriously mentally retarded*. The trial court focused on the positive comments about Wilson in the school record and noted that he was found competent to stand trial.

We find that Wilson's school record constitutes some evidence that he is mentally retarded. The record indicated that during his developmental period, Wilson had an IQ below 70 and some deficits in adaptive behavior. The fact that the record also contained positive indications of Wilson's adaptive behavior goes to the weight and credibility of the evidence, which should be considered by the factfin-

der in the context of an evidentiary hearing. The Commonwealth notes that Wilson partially conducted his own defense at trial and suggests the school record is fabricated. These contentions also go to the weight and credibility of the evidence and do not affect the prima facie showing required to justify an evidentiary hearing. And we note that mentally retarded offenders can be competent to stand trial.[25] So Wilson's competency to stand trial finding has no bearing on his entitlement to a hearing on the mental retardation motion. Accordingly, we reverse the trial court's order and remand the mental retardation motion to the trial court for an evidentiary hearing.

### 4. Kentucky's Procedures for Adjudicating Mental Retardation Claims Do Not Violate Wilson's Due Process Rights.

■ Wilson argues that Kentucky's procedures for adjudicating mental retardation claims of capital offenders violate his due process rights in two ways: (1) by denying his right to a jury determination of whether he is mentally retarded and placing the burden on him to prove that he is mentally retarded by a preponderance of the evidence and (2) by requiring proof of mental retardation near the time of the crime. We disagree.

### a. No right to jury determination or to place burden on the Commonwealth.

Wilson contends that the Commonwealth should have the burden of proving

---

21. *Id.* at 382.

22. *Id.* at 383.

23. *Id.* at 384 (emphasis added).

24. "The fact that our statute refers to persons with IQs of 70 or below as 'severely' mentally retarded does not change the fact that an IQ of 70 or below includes the mildly, moderate-

ly, severely, and profoundly mentally retarded" with IQs of 50–55 and 70 under the AAMR (now the American Association on Intellectual and Developmental Disabilities) guidelines. *Bowling*, 163 S.W.3d at 373 (citations omitted).

25. *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242.

to a jury that he is not mentally retarded beyond a reasonable doubt. He bases this argument on Section 11 of the Kentucky Constitution, which guarantees a criminal defendant the right to "a speedy public trial by an impartial jury of the vicinage[.]"[26]

We held in *Bowling* that "an otherwise death-eligible defendant is not entitled to have a jury decide the mental retardation exemption claim."[27] And we recognized that a defendant may be constitutionally required to prove mitigating circumstances, including the existence of mental retardation.[28] So we placed the burden on the defendant to prove that he is mentally retarded by a preponderance of the evidence.[29]

While the Appellant's argument in *Bowling* was premised only on the U.S. Constitution, we noted that Sections 7 and 11 of the Kentucky Constitution "pertain only to the issue of guilt or innocence and not 'to the fixing of the penalty since that function was no part of the common law mode of trial.'"[30] Under Kentucky procedures, the trial court determines whether defendants are eligible for the death penalty; but the jury ultimately recommends whether to impose the death penalty.[31] So requiring an offender to prove to a trial court by a preponderance of the evidence that he is

mentally retarded does not violate Wilson's rights under the federal or state constitutions.

**b.   Proof of mental retardation near the time of the crime.**

Wilson argues that *Bowling* contradicts *Atkins v. Virginia*[32] and KRS 532.130–140 by requiring proof of mental retardation around the time of the defendant's crime. We disagree with Wilson's reading of the case.

In *Bowling,* the Appellant asserted that it was unconstitutional to determine mental retardation before trial rather than after conviction. We disagreed because "[i]f diminished personal culpability is the rationale for not executing a mentally retarded offender, logic dictates that the diminished culpability exist at the time of the offense, not necessarily at the time of the execution."[33] And if the determination occurred post-conviction, the offender's IQ test could be skewed by depression, tension, and anxiety; and the death row defendant may have a stronger motivation to malinger.[34] But we recognized that the issue "is more semantical than real" because mental retardation becomes apparent before adulthood and is a permanent,

---

26.   Wilson also points to the practices of other states. He asserts that Virginia, New Jersey, and Oklahoma require a jury determination and that New Jersey's and New Mexico's procedures (before abolishing the death penalty) made a defendant ineligible for the death penalty if only one juror found that the defendant met the preponderance burden. But we acknowledged the practices of most of these states in *Bowling,* and Wilson does not argue that there has been a momentum shift among the states on these issues.

27.   *Bowling,* 163 S.W.3d at 381.

28.   *Id.*

29.   *Id.* at 382.

30.   *Id.* at 377 n. 19 (*citing Allison v. Gray,* 296 S.W.2d 735, 737 (Ky.1956); *Perry v. Commonwealth,* 407 S.W.2d 714, 715 (Ky.1966); *Williams v. Jones,* 338 S.W.2d 693, 694 (Ky. 1960); and *Lee v. Buchanan,* 264 S.W.2d 661, 661 (Ky.1954)).

31.   KRS 532.955(2) and KRS 532.135.

32.   536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

33.   *Bowling,* 163 S.W.3d at 376.

34.   *Id.*

relatively static condition.[35] So it is unlikely for an offender to develop mental retardation post-conviction.[36]

*Bowling* does not restrict evidence of mental retardation to that existing at the time of the offense. And it does not require proof of a nexus between a defendant's mental capacity and his crime.[37] Rather, the *Bowling* Court held that it was constitutional to require a mental retardation determination pre-trial rather than post-conviction.

This is consistent with KRS 532.130, which defines a *seriously mentally retarded offender* as having an IQ of 70 or below and substantial deficits in adaptive behavior, existing concurrently and manifesting **during the developmental period.** Because mental retardation is a relatively static condition, a test result of an IQ of 70 or below obtained near the time of the crime (or post-conviction) is relevant to whether a defendant had an IQ of 70 or below during his developmental period and, therefore, meets that portion of the statutory definition of *seriously mentally retarded.* It would be exceedingly rare for mental retardation to recede during the time between a defendant's developmental period and the time of the crime.[38]

If a defendant can prove by a preponderance of the evidence that he has an IQ of 70 or below near the time of the crime or post-conviction, then the trial court can infer that he also had an IQ of 70 or below during his developmental period. And if evidence exists that a defendant had an IQ of 70 or below during his developmental period, an IQ test result of above 70 around the time of the crime or post-conviction weighs against the earlier result. In such a case, the trial court must analyze the weight and credibility of both results in determining whether the offender is *seriously mentally retarded* under KRS 532.130.[39]

■ So *Bowling* does not contradict the Supreme Court's holding in *Atkins* or KRS 532.130. To find that a capital offender is mentally retarded and, therefore, exempt from the death penalty, proof that the offender had an IQ of 70 or below near the time of the crime or post-conviction is relevant to whether the offender had an IQ of 70 or below during his developmental stage; but such proof is not required.

## B. Motion for DNA Testing.

Under KRS 422.285, Wilson moved for DNA testing of hair recovered from the victim's vehicle and semen found on the backseat of the victim's vehicle. The statute says that a person convicted of a capital offense may request DNA testing and

---

**35.** *Id.* at 377.

**36.** *Id.*

**37.** So *Bowling* does not contradict *Tennard v. Dretke,* 542 U.S. 274, 287, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), which states that "[n]othing in [*Atkins*] suggested that a mentally retarded individual must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered."

**38.** *See Bowling,* 163 S.W.3d at 377 (noting that because mental health retardation is a permanent, static condition, it would be rare for the condition to recede between the time of offense and execution).

**39.** If we did not take this view, then defendants whose IQ was never tested during the developmental period would not be able to prove that they are *seriously mentally retarded.* In *Paisley,* the defendant's IQ had never been tested; but he presented enough evidence of deficits in adaptive behavior to warrant an evidentiary hearing to determine whether he was mentally retarded. *Paisley,* 201 S.W.3d at 36. So the trial court ordered, and we approved of, mental health testing for the defendant over twenty years after his conviction. *Id.*

analysis of evidence under certain circumstances. Under subsection (2), the trial court "shall order" DNA testing if

(a) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing and analysis;

(b) The evidence is still in existence and is in a condition that allows DNA testing and analysis to be conducted; and

(c) The evidence was not previously subjected to DNA testing and analysis or was not subjected to the testing and analysis that is now requested and may resolve an issue not previously resolved by the previous testing and analysis.

A trial court "may order" DNA testing under subsection (3) if

(a) A reasonable probability exists that either:

1. The petitioner's verdict or sentence would have been more favorable if the results of DNA testing and analysis had been available at the trial leading to the judgment of conviction; or

2. DNA testing and analysis will produce exculpatory evidence;

(b) The evidence is still in existence and is in a condition that allows DNA testing and analysis to be conducted; and

(c) The evidence was not previously subject to DNA testing and analysis or was not subjected to the testing and analysis that is now requested and that may resolve an issue not previously resolved by the previous testing and analysis.

The trial court denied Wilson's DNA motion. On appeal, Wilson argues that (1)

this Court must reverse the trial court's order because it did not apply the correct standard, and it failed to address Wilson's request for DNA testing on the semen; (2) he is entitled to DNA testing of the hairs and semen under KRS 422.285; (3) he has a constitutional right to post-conviction DNA testing; and (4) he is entitled to an evidentiary hearing to determine if the hairs are in existence or if they were destroyed after the preservation order.

We affirm the trial court's order denying DNA testing of the hairs and hold that Wilson is not entitled to an evidentiary hearing to determine if the hairs are in existence or if they were destroyed after the preservation order. But we remand to the trial court to hold a hearing and enter an order on Wilson's motion for DNA testing of the semen.

### 5. DNA Testing on the Hairs.

■ We reject from the outset the Commonwealth's contention that Wilson's DNA claim is barred under the doctrine of laches. We recently held in *Moore v. Commonwealth*,[40]

> This Court will not apply the doctrine of laches to claims under the post[-]conviction DNA testing statute. Not only does the statute not include a limitation period, as most collateral attack procedures do, *see, e.g.,* RCr 11.42 (requiring most filings within three years), the statute specifically says that a petition can be filed "[a]t any time" after conviction of and sentencing to death for a capital offense, KRS 422.285(a). This reflects a policy decision by the General Assembly to allow death row petitioners to seek DNA testing even at a late date.

So Wilson's DNA motion is not untimely.

### a. Trial court's ruling.

■ Wilson argues the trial court's order does not apply the reasonable proba-

---

**40.** 357 S.W.3d 470, 494 (Ky.2011), *as modi-* *fied on denial of reh'g* (Nov. 23, 2011).

bility standard under KRS 422.285(3)(a) because the order reads, "This Court further finds that the Defendant has failed to establish that the verdict or sentence would have been more favorable had DNA testing of hairs revealed that they did not belong to the Defendant."

■ As detailed above, KRS 422.285(3)(a) provides that a trial court "may" order DNA testing if there is a reasonable probability that the verdict or sentence would have been more favorable if the results had been available at the trial or if the results will produce exculpatory evidence. Although the trial court's written order omits the phrase, "reasonable probability," with respect to subsection 3(a), the trial court appropriately applied this standard. The trial court's written order explicitly states that a reasonable probability did not exist under subsection 2(a). And the trial court used the reasonable probability standard in its ruling from the bench on both subsections 2(a) and 3(a). Moreover, "an appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result."[41] So even if the trial court applied a higher standard, we find that the trial court properly denied Wilson's motion for DNA testing of the hairs recovered from the victim's car.

Under KRS 422.285(2) and (3), the movant must show that "the evidence sought would either exonerate the defendant, lead to a more favorable verdict or sentence, or otherwise be exculpatory. To do this, the movant must describe the role the evidence would have had if available in the original prosecution."[42] And "subsec-tions[ ](2)(a) and (3)(a)(1) require the court to undertake the 'reasonable probability' analysis under the assumption that the evidence will be favorable to the movant."[43]

At the time of Wilson's trial, DNA testing was unavailable. At trial, a forensic examiner testified that he examined around a thousand hairs that were recovered from the victim's car. Comparison testing revealed that some of the hairs matched Wilson's hair. The prosecutor contended in his closing argument that this result proved Wilson was in the car.[44] But the examiner could not positively identify the hair as Wilson's through this type of testing. And the examiner testified that numerous hairs collected from the victim's vehicle did not match Wilson, his co-defendant, or the victim. Trial testimony also revealed that the victim's car was abandoned for days before police discovered it in a scrap yard. And it was evident that other people had been in the car during that time period.

Assuming that DNA testing would reveal the hairs are not Wilson's, there is not a reasonable probability that Wilson would not have been prosecuted or convicted, that the evidence would lead to a more favorable verdict or sentence, or be otherwise exculpatory. Even if the hairs were not Wilson's, it would not prove that he was never inside the car. At most, it would only show that other people had been inside the car, which the jury already knew because numerous hairs did not match Wilson, his co-defendant, or the vic-

41. *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky.2009) (citations omitted).

42. *Bowling v. Commonwealth*, 357 S.W.3d 462, 468 (Ky.2010).

43. *Id.*

44. This Court does not have the full trial record before it. So we make such statements based on Wilson's assertions, which the Commonwealth does not contest, and not on the full trial record.

tim.[45] And despite the prosecutor's statement in closing argument, the examiner testified that comparison testing could not positively identify the hairs as Wilson's.

Apart from the forensic examiner's evidence concerning the hairs, the jury heard substantial evidence to convict Wilson of murder, kidnapping, first-degree robbery, and criminal conspiracy to commit robbery. "Testimony at trial from various sources, including Humphrey[, Wilson's co-defendant], indicated that the victim was forced into the [backseat] of her own car[,]" where Wilson eventually raped and killed her.[46] The victim's credit card was used to make several purchases in various stores, including Kmart. Wilson and Humphrey were seen and identified as a couple that stayed in an Indiana hotel just after the murder. And the hotel room where Wilson and Humphrey were arrested contained clothing with Kmart price tags. Humphrey's friend testified that Humphrey told her of the crimes that she and Wilson committed. And Wilson's cellmate testified that Wilson confessed his involvement in the murder and rape. So the trial court did not err in finding that there was no reasonable probability that a favorable DNA testing result of the hairs would exonerate Wilson, lead to a more favorable verdict or sentence, or otherwise be exculpatory.

### b. Preservation order.

■ Wilson is not entitled to an evidentiary hearing to determine if the hairs are in existence or if they were destroyed after the preservation order. Because we hold that the reasonable probability standard is not met under KRS 422.285(2)(a) or 3(a), there is no reason to hold an evidentiary hearing to determine whether the hairs are in existence for purposes of KRS 422.285(2)(b) or 3(b). But Wilson contends a hearing is necessary to determine whether the Commonwealth violated a preservation order the trial court entered in October 1996.

When a movant files for DNA testing under KRS 422.285, a trial court must order the Commonwealth to preserve all evidence in the Commonwealth's possession or control that could be subjected to DNA testing.[47] "If the evidence is intentionally destroyed after the court orders its preservation, the court may impose appropriate sanctions, including criminal contempt."[48] Here, the trial court ordered the Commonwealth to preserve all evidence in October 1996. This was not under KRS 422.285 because the statute was not enacted until 2002. So KRS 422.285(6) does not apply to the Commonwealth's alleged violation of the preservation order. Instead, the issue concerns an alleged general violation of a court order.

■ A trial court has broad discretion in addressing a violation of its order. For instance, CR 37.02 provides sanctions a court *may* enforce for failure to comply with court ordered discovery. We review a trial court's ruling regarding a discovery violation, including a decision not to impose sanctions, for abuse of discretion.[49]

---

45. See *Bowling*, 357 S.W.3d at 469 ("[E]ven if someone else's DNA was found on the jacket, this would not exonerate Appellant[;] and even with an alternate perpetrator theory, the presence of someone else's DNA would not necessarily be exculpatory.").

46. *Wilson*, 836 S.W.2d at 876–77.

47. KRS 422.285(6).

48. *Id.*

49. *Penman v. Commonwealth*, 194 S.W.3d 237, 249 (Ky.2006) (citation omitted) *overruled on other grounds by Rose v. Commonwealth*, 322 S.W.3d 76 (Ky.2010); *See also Morton v. Bank of the Bluegrass and Trust Co.*, 18 S.W.3d 353, 360 (Ky.App.1999) (finding that the trial court did not abuse its discretion

"The test to determine an abuse of discretion turns on whether the decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." [50]

We disapprove of the Commonwealth's apparent lack of diligent efforts to locate the hairs, but we will not remand for an evidentiary hearing.[51] Wilson has offered scant evidence that the hairs were still in existence even before the 1996 preservation order.[52] And Wilson is not entitled to DNA testing of the hairs because there is no reasonable probability that a favorable result would change the outcome of his trial. So he cannot show that any alleged violation of the order was prejudicial. We find that the trial court acted within its discretion when it refused to grant an evidentiary hearing on the matter.

### 6. DNA Testing of the Semen.

█ The trial court's order erroneously failed to address Wilson's request for DNA testing of the semen found on the victim's car seat. The trial court's written order and oral ruling from the bench denied DNA testing of only the hairs. So we remand the case to the trial court to determine whether DNA testing of the semen is appropriate under KRS 422.285.

"[A] circuit court need not necessarily make separate findings for each piece of evidence to be tested." [53] So a blanket order denying or authorizing DNA testing of all evidence can be appropriate. But the trial court here specifically referenced the hairs when it denied DNA testing, without mentioning the semen. For that reason, we are uncertain whether the trial court considered the evidence apart from the hairs.

Wilson's claim for DNA testing of the semen also appears to be stronger than testing of the hairs.[54] Wilson was convicted of rape, one of the statutory aggravating circumstances necessary for the death penalty verdict. The evidence at trial supporting this conviction was largely testimonial. And the only physical evidence corroborating the testimony was human semen found in the backseat of the victim's car. Wilson asserts that in closing argument, the prosecutor mentioned the presence of the semen as proof that Wilson raped the victim.

Assuming that DNA testing shows the semen is not Wilson's, this is quasi-exculpatory evidence because it neither exculpates nor inculpates him. It does not prove that Wilson did not rape the victim, but it does prove that someone else's se-

---

in not sanctioning a party for a discovery violation).

**50.** *Terry v. Commonwealth*, 332 S.W.3d 56, 60 (Ky.2010) (citation omitted).

**51.** In 2001, in Wilson's habeas proceedings, a federal district court ordered DNA testing of the hairs. The Attorney General testified that the hairs could not be found but that they were continuing to search for them. There is nothing in the record indicating that the Commonwealth continued its search. Present counsel for the Commonwealth has confirmed the lab that conducted the original testing on the hairs cannot locate the hairs but has looked no further. So the Commonwealth only claims that the hairs "may not be in

existence." In different circumstances, an apparently cursory search would not be adequate.

**52.** Wilson claims that the forensic examiner informed counsel in August 1996 that he had examined and retained hairs from the car. But this off-the-record statement alone cannot conclusively establish that the hairs were physically present in the laboratory.

**53.** *Moore*, 357 S.W.3d at 496.

**54.** The Court is not in a position to state with certainty what role the semen played in Wilson's rape conviction because the full record is not before us.

men was in the car.[55] Upon remand, the trial court must assume the DNA results would be quasi-exculpatory and determine whether a reasonable probability exists that the evidence would result in a more favorable verdict or sentence, particularly with respect to Wilson's rape conviction.[56] To make this determination, the trial court will need to review the trial transcript and analyze the significance of the semen in Wilson's conviction.

### 7. Constitutional Claims.

In addition to his statutory claims, Wilson argues that he is entitled to DNA testing under the Due Process Clause, the Eighth Amendment of the U.S. Constitution, Section 77 of the Kentucky Constitution, and a right to exculpatory evidence.

We recently addressed many of these constitutional claims in Bowling.[57] Citing the U.S. Supreme Court's decision in Dist. Attorney's Office for Third Judicial Dist. v. Osborne,[58] we held that there is no substantive due process right to post-conviction DNA testing.[59] We also held that procedural due process "requires no additional rights beyond what is already provided in KRS 422.285 and the various post[-]conviction procedures found in Kentucky law."[60] Wilson's claim to DNA testing based on the right to exculpatory evidence also fails because, as we noted in Bowling, "[t]rial rights, such as the one to disclosure of exculpatory evidence . . . are simply inapplicable in the post[-]conviction setting."[61] Finally, Wilson's claim under the Eighth Amendment fails under our holding in Bowling.

> [B]ecause this claim is one for a procedure needed to effectuate another right, it is actually a due process claim, where the substantive right (or liberty interest) to be protected stems from the Eighth Amendment. As noted above, there is no substantive due process right to DNA testing, nor is there a procedural due process right to anything beyond what KRS 422.285 currently provides.[62]

Only Wilson's claim based on Section 77 of the Kentucky Constitution is not addressed in Bowling. Wilson claims that he has a substantive due process right to DNA testing to support his request for clemency under Section 77 of the Kentucky Constitution. We disagree.

■ Similar to Wilson's argument under the Eighth Amendment, this claim is actually one for a procedure needed to effectuate another right. So it is a due process claim in which the substantive right to be protected stems from clemency proceedings under Section 77 of the Kentucky Constitution. As noted above, there is no substantive due process right to

**55.** See Bedingfield v. Commonwealth, 260 S.W.3d 805, 811 (Ky.2008) (describing nonmatch DNA evidence as that which, standing alone, neither exculpates nor inculpates a defendant).

**56.** We also note that if on remand the trial court grants Wilson's motion for DNA testing of the semen, the trial court has the discretion to order specific types of DNA testing at an outside facility consistent with Moore, 357 S.W.3d 470. And "[i]f the Commonwealth objects that the evidence is not testable, since the state is the custodian of the evidence, the Commonwealth must go forward with expert testimony as to the viability of testing, which

the movant may rebut." Bowling, 357 S.W.3d at 468.

**57.** 357 S.W.3d 462 (Ky.2010).

**58.** 557 U.S. 52, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009).

**59.** Bowling, 357 S.W.3d at 466.

**60.** Id.

**61.** Id. (citations omitted).

**62.** Id. at 467.

DNA testing, nor is there a procedural due process right to anything beyond what is currently provided. There is also no substantive right to be granted clemency under Section 77 of the Kentucky Constitution. Section 77 grants the power to "remit fines and forfeitures, commute sentences, grant reprieves and pardons" to the Governor. But the decision to grant clemency is left to the Governor's unfettered discretion.[63]

■■■■ Procedural due process in clemency proceedings requires only "that a death row prisoner receive the clemency procedures explicitly set forth by state law" and that a state not arbitrarily deny a prisoner all access to the clemency process.[64] And, in Kentucky, "no [clemency] procedures are even arguably mandated."[65] "There exist only two constitutionally mandated requirements under Section 77: that the movant file an application for clemency with the Governor[ ] and that the Governor file with each application a statement of the reasons for his decision."[66]

Wilson is not being denied access to the clemency process, and he is not entitled to procedures beyond those provided for in Section 77 of the Kentucky Constitution. So Wilson has failed to show that he has not received the procedural or substantive due process for clemency.

## III. CONCLUSION.

For the foregoing reasons, we vacate the trial court's ruling on Wilson's mental retardation motion and remand the case to the trial court to hold an evidentiary hearing within 180 days from the entry of this opinion on whether mental retardation prevents his execution. If the trial court

rules that Wilson is mentally retarded, it shall enter an order granting a new sentencing phase in which the death penalty is not an option. If the trial court determines after the evidentiary hearing that Wilson is not mentally retarded, then it shall make findings of fact in support of this conclusion in its order, which shall be appealable by Wilson.

As to the DNA motion, we affirm the trial court's denial of DNA testing of the hairs; but we remand the case to the trial court to determine within 180 days from the entry of this opinion whether DNA testing of the semen is warranted under KRS 422.285, taking into account the trial record. If the trial court finds that DNA testing of the semen is not warranted, then it shall make findings of fact in support of this conclusion in its order, which shall be appealable by Wilson.

The trial court shall notify this Court of its final disposition of these matters within ten days of the entry of its final order. Any appeal taken from an adverse ruling on these matters shall be consolidated with this appeal and limited to the issues addressed on remand.

All sitting. MINTON, C.J.; ABRAMSON, NOBLE, SCOTT, and VENTERS, JJ., concur. CUNNINGHAM, J., dissents by separate opinion in which SCHRODER, J., joins.

CUNNINGHAM, J., Dissenting:

Almost twenty-five years ago, on the night of May 29, 1987, Deborah Pooley was getting out of her car at her apartment in Covington, Kentucky. Gregory Wilson and his girlfriend, Brenda Humphrey, forced Ms. Pooley back into her car at

---

63. *Baze v. Thompson,* 302 S.W.3d 57, 60 (Ky. 2010).

64. *Id.* (citations omitted).

65. *Id.* (citations omitted).

66. *Id.* (citation omitted).

knife point and abducted her. The victim was taken to a secluded place on the flood-wall, where Wilson tied her hands with a lamp cord and raped her in the back seat of the car. All the time, Ms. Pooley was begging for her life. "Please don't kill me. I don't want to die." In spite of her pitiful pleadings, Wilson strangled her to death. The two murderers then headed for Indiana. The victim's naked body was discarded in a wooded thicket in a remote area. There, it was discovered over two weeks later, identifiable only by comparing dental x-rays on the remaining teeth. So needlessly and cruelly ended the earthly existence of one Deborah Pooley.

The day after the murder, Wilson and his helper callously went on a shopping spree in Indiana using the victim's credit card. Their haul included women's shoes and hosiery, a man's Seiko watch, a woman's Gruen watch, cosmetic items, clothing and gas.

I briefly recount this terrible night a quarter of a century ago so we don't lose sight of the horrific crime committed by Gregory Wilson. So that in balancing our scales of rights and wrongs, we don't forget after all these years that an innocent person named Deborah Pooley was ruthlessly murdered and her killer is still in the courts of this state.

Gregory Wilson was tried and convicted and sentenced to death in 1988 after going through at least a half dozen defense lawyers and finally serving as co-counsel himself. The murder conviction was upheld by this Court in 1992. The kidnapping conviction went back and forth to this Court a couple of times. Wilson was back before this Court in 1998 on his RCr 11.42 appeal. We once again affirmed his conviction. He also filed a habeas corpus petition in the U.S. District Court which was denied in 2007, and the Sixth Circuit declined his appeal. In 2010, he was back

before the trial court under CR 60.02 and, for the first time in twenty years of litigation, raised the issue of mental retardation and DNA testing. And now Gregory Wilson is back before us on that case.

I strongly disagree with the broad statement by the majority that "[b]ecause Wilson was convicted before KRS 532.130–140 became effective, he could not have procedurally defaulted on his mental retardation claim." Wilson first had the chance to raise any mental retardation issue at his trial. KRS 505.020 provided him the opportunity to raise mental retardation as a defense. Here is where this case is strikingly different from the *Skaggs* case, which is cited for support by the majority. Skaggs raised his own mental capacity from the beginning with his trial in 1982, and that issue was a part of his numerous challenges. Not only did Wilson fail to raise any mental impairment, but he acted as co-counsel in his own defense.

It is important to point out that Wilson was evaluated by the Kentucky Correctional Psychiatric Center ("KCPC") prior to his trial. The court was advised of this evaluation and the conclusion that he was competent to stand trial. The full report has been retained by KCPC and never released to the Commonwealth. For all these years, the Commonwealth has been denied access to this information by KCPC, citing provisions of the Health Insurance Portability and Accountability Act ("HIPPA") of 1996. We can presume that Wilson and his attorneys have had full access to this report for all this time. Over the past twenty-five years, Wilson has litigated his death sentence extensively. This is the third trip back before this Court. Never, until now, has he raised the mental retardation issue.

It is true, as the majority states, that KRS 532.130–140 was not enacted until July 13, 1990, some two years after Wil-

son's trial. However, for over twenty-two years since its enactment, this remedy has been available to him in his post-trial litigation. This includes his RCr 11.42 motion in the Kenton Circuit Court, which was rejected and which this Court upheld in 1998; his petition for writ of habeas corpus filed in the U.S. District Court for the Eastern District of Kentucky, which was denied by the Court of Appeals for the Sixth Circuit in 2008; and his attempt to intervene in the CR 60.02 action of co-defendant, Brenda Humphrey, which was finally unsuccessful in 2005. He even filed a suit, pursuant to 42 U.S.C. § 1983, as late as 2010 challenging Kentucky's lethal injection protocol. These are not to mention the opportunity over the last twenty-five years to bring an independent action under CR 60.02. In none of these actions did he raise either the issue of mental retardation or the DNA examination of the semen. It was not until April of 2010 that Wilson, for the first time, raised his mental status as an issue, as well as the request for further DNA testing, before the Kenton Circuit Court. With all of this time and extensive litigation, it is difficult to understand how he has not procedurally defaulted on these issues. I submit that just because persons are tried before the enactment of KRS 532.130–140, they are not immune from being procedurally in default.

Even if Wilson has not procedurally defaulted, the record is replete with evidence that he does not meet the statutory criteria for being mentally retarded.

To support his recent claim of mental retardation, Wilson has retrieved from his evidentiary dust bin old records, which were apparently in his exclusive possession for all these many years, showing an IQ evaluation of 62 at age fourteen. This came from old school records referring to him as mildly retarded *yet able to adjust to school*. Even his own evidence presented at this late hour shows that on the record, and without the necessity of a hearing, he has failed the second prong of the mental retardation definition. In light of Wilson's subsequent behavior, including his acting as co-counsel in regard to his own defense and throughout the post-trial litigation, it is clear to me that the trial court was correct in finding that, in spite of the suspect low IQ record, there is insufficient proof of record that he suffers from a substantial deficit in adaptive behavior.

KRS 532.130(2) defines a mentally retarded offender as a "defendant with significant subaverage intellectual functioning *existing concurrently with substantial deficits in adaptive behavior.*" (Emphasis added.) There must be both a low IQ of 70 or below *and* a deficit in adaptive behavior. It is a two-prong test. It is abundantly clear to me, as it was to the trial judge from the extensive record, and without a hearing, that the second prong does not exist. It starts with the school people who proclaimed "his adjustment to school would be no problem" and runs through the extensive court record where he has successfully staved off the carrying out of his sentence for almost twenty-five years due, in large part, to his own legal prowess in representing himself.

There are over sixteen pages of handwritten pleadings in the record composed by Wilson. This includes a well-structured "Motion and Request for New Trial" filed on October 5, 1988. One only has to read these writings, placed in proper legal format, to be convinced that his mental retardation claim is totally without merit. The pleadings are well-written, articulate, organized, and possessed of the writing skills and vocabulary that many college graduates do not possess.

Even in protracted and complex capital litigation, common sense still has its place.

Much has happened in the world since Wilson's 1988 conviction. We have seen the advent of DNA analysis and its value as an investigative opportunity. It is true that this science had not evolved at the time of Wilson's trial and conviction to the point it is today. However, KRS 422.285 has been around since 2002 and, as in the mental retardation issue, the DNA testing request is a part of Wilson's 2010 gang plank strategy. KRS 422.285(2)(a) states that a trial court "shall order" DNA testing if there is a "reasonable probability" that the defendant would not have been convicted if exculpatory results had been obtained from the testing. Even the majority states that a DNA result finding the semen on the backseat of the car belonged to someone else neither "exculpates nor inculpates" Wilson. At its most probative, it does not exonerate him.

Lay the words of the majority side by side: "This is quasi-exculpatory evidence because it neither exculpates nor inculpates him." But then in the next breath our opinion states that the trial court must determine whether "a reasonable probability exists that the evidence would result in a more favorable verdict or sentence, particularly with respect to Wilson's rape conviction." If it is not exculpatory, then I fail to see where there can be a "reasonable probability" of it providing a more favorable verdict or sentence. The first finding precludes the latter. And we've already made the decision for the trial court. By remanding for what seems to me a useless exercise, we propel this case toward its third decade of litigation.

Any value of this tardily requested evidence is weakened even further when we consider the passage of time. We must assume that the car of the murder victim is still in existence, since I have learned of no claim by the Commonwealth being made otherwise. We do know, however, that it was abandoned for many days after the crime. After its discovery in a scrap yard, it was not removed from the premises for several days. Several people had access to the vehicle and numerous items had been removed. When it was recovered by the police, it was missing turn signals, ashtrays, radio controls, heater controls, a mirror, and the glove box had been emptied. Also, oil had been poured on the floorboard and in the back.

It appears that the majority of our Court today is remanding this issue to the trial court without regard to the overwhelming evidence of Wilson's guilt. The records are replete throughout his litigation in state and federal courts of the overwhelming evidence of his guilt. In fact, the scientific evidence produced at trial concerning any hair or semen within the car was of small consequence. He and his co-defendant had both confessed several times. They were seen and identified as the couple who stayed at a hotel just after the murder driving the victim's car and using her credit cards for a shopping spree. The overwhelming nature of the evidence was so noteworthy that it was mentioned in the federal court case of his habeas corpus action.

It is a sad commentary upon our judicial system that after almost twenty-five years since the crime was committed our Court today is proclaiming that we still haven't got it right. It is certainly no solace to the family of Deborah Pooley.

I respectfully dissent.

In closing, I note that this Court is sending this case back to the trial court for further proceedings. Why do we invite additional issues and litigation on the DNA examination by asking the trial court to make findings on whether testing of the

semen is warranted? I strongly urge that we use this remand to go ahead and test the DNA and have this issue removed from this incredibly elongated case forever.

SCHRODER, J., joins.